**CHRISTENSEN JAMES & MARTIN, CHTD.**
Daryl E. Martin (6735)
Dylan J. Lawter (15947)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Email: dem@cjmlv.com, djl@cjmlv.com
*Attorneys for Nevada Service Employees Union*
*aka SEIU Local 1107*

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SUNRISE HOSPITAL AND MEDICAL CERNTER, LLC D/B/A SUNRISE HOSPITAL & MEDICAL CENTER, <br><br>      Plaintiff, <br><br> v. <br><br> LOCAL 1107 OF THE SERVICE EMPLOYEES INTERNATIONAL UNION, <br><br>      Defendant. | CASE NO.:  2:24-cv-01247-CDS-MDC <br><br> **RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

     Nevada Service Employees Union, named in this action as Local 1107 of the Service Employees International Union ("Local 1107"), acting by and through its attorneys, Christensen James & Martin, Chtd., hereby submits its Response to the Motion for Preliminary Injunction filed by Sunrise Hospital and Medical Center ("Sunrise" or "Hospital").

Dated this 16th day of August, 2024.

                                       CHRISTENSEN JAMES & MARTIN

                                       By:  */s/ Daryl E. Martin*
                                       Daryl E. Martin, Esq.
                                       *Attorneys for SEIU Local 1107*

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTS / INTRODUCTION

Sunrise Hospital's Motion for Preliminary Injunction is premised on the alleged breach of the Parties' collective bargaining agreement (the "CBA"). Sunrise claims to be concerned about public criticism of it business practices. But it is not clear that its Complaint even alleges that relevant public criticism actually occurred. The Complaint alleges that Local 1107 violated the agreement by adding front and back covers to the CBA incorporating statements ("Respect us. Pay us. Protect us. Unions for all") and photographs depicting union members holding signs that said, "HCA Healthcare: Put Patients Over Profits!" However, Sunrise only alleges that the CBA copies with such covers were distributed to certain union members. *See* Rietz Declaration (ECF No. 11-2) at ¶ 12. Local 1107 has since confirmed that the copies were given to members of the bargaining unit and stewards, so that they could perform their function of contract administration and enforcement. *See* Exhibit A, Declaration of Kevin Patrick O'Connor, at ¶ 8. This is not the first time Local 1107 has distributed copies of Sunrise CBAs with covers bearing photos similar to those now disputed by Sunrise. *Id.* at ¶ 9. Local 1107 did the same thing with the previous CBA. *Id.* at ¶ 10; *see also* ECF No. 11-6 (email from Jason Klumb confirming that the previous CBA cover had similar photos). Photos used on the cover of the CBA dated April 1, 2020 to March 31, 2023 were similar to those that are presently at issue, stating, "Respect us, Protect us, Pay us" and "HCA Profits 2020-$3.75 Billion (up 7% from 2019)." *See* Exhibit B; *see also* O'Connor Declaration at ¶¶ 11–12.

Furthermore, remarkably similar photos to those found on the CBA covers were posted by Local 1107 in Sunrise Hospital bulletin boards, after notice to the Hospital, and without objection from the Hospital, on multiple occasions. *See, e.g.*, Exhibit C (June 5, 2023 email from Kevin Patrick O'Connor, Local 1107 Organizing Coordinator to Joan Kane, Sunrise Hospital Director of Labor Relations, regarding a flyer that was "posted at Sunrise Hospital" depicting multiple union members holding the same signs about which Sunrise has complained,

bearing the slogan "HCA Healthcare: Put Patients Over Profits!"); *see also* Exhibit D (June 29, 2023 email regarding a similar flyer that was posted). Mr. O'Connor's Declaration (Exhibit A, at ¶¶ 14–15) confirms that the Hospital did not object to the flyers, despite them being posted in Hospital-provided bulletin boards, and despite the existence of CBA Section 3.1 (Bulletin Boards) which Sunrise now claims prohibits the use of photos "critical of any Hospital…policy relating to patient care…." ECF No. 11-3, page 8. The language of Section 3.1 in the prior CBA (2020-2023) and the current CBA (2023-2026) is identical. Accordingly, Sunrise was aware of the prior instances in which identical signs were depicted in photos, but it did not allege a violation, leaving Local 1107 to conclude that neither party felt that the photos violated any part of the CBA.

Local 1107 does not believe Sunrise has a genuine concern regarding the loss of public trust. Sunrise seemingly had no problem a year ago when photos of the same signs / placards were posted at the Hospital. Sunrise waited to object until now, when the Parties are scheduled to start negotiating on August 14, 2024, a contract covering a new bargaining unit including professionals (clinical pharmacists, medical technologists, physical therapists, occupational therapists, social workers, speech language pathologists) following an election held in January 2024. *See* Exhibit E (NLRB Bargaining Order). These facts indicate that this lawsuit is being used by Sunrise for an ulterior purpose—to gain an advantage in the labor negotiations related to the professionals bargaining unit. Sunrise's admission in the Complaint at ¶ 21, which confirms that members of Local 1107 have a history of displaying signs like those displayed in the complained-of photos during labor negotiations, is also consistent with the conclusion that this lawsuit is intended to affect labor negotiations. Regardless, the signs displayed by members of Local 1107 and the use of photos depicting such signs on the covers of the Parties' CBA constitute speech protected by federal law.[1] It is likely that Sunrise hopes to use this lawsuit to

---

[1] Employers, employees, unions, and union members have the right to speak freely regarding workplace-associated matters "so long as the communications do not contain 'a threat of reprisal or force or promise of benefit.'" *Local Joint Exec. Bd. v. NLRB*, 515 F.3d 942, 944 (9th

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

effectively prevent Local 1107 or its members from exercising such rights during the upcoming labor negotiations.

As shown in Local 1107's Motion to Dismiss Complaint (ECF No. 12), the breach of contract claim is unlikely to succeed for numerous reasons, and as a result, Sunrise is not entitled to a preliminary injunction. Sunrise asks the Court to require Local 1107 to cease printing, distributing, or using copies of the CBA that are bound with the covers depicted in Exhibit 2 to the Complaint, and to "collect and destroy all such bound" copies of the CBA "that have been distributed to date." Sunrise also asks the Court to engage in prior restraint, by prohibiting speech that has not yet occurred. *See* Complaint (ECF No. 1), Page 8, at ¶ F(1)(a) (demanding a preliminary injunction prohibiting Local 1107 from using, in the future, "any other type of cover which would contain similar images or language targeting and/or portraying Plaintiff, its affiliate organizations, and leadership in a similar fashion…."). Sunrise's prior restraint request is itself evidence of its real intent: utilize federal court power to silence employees who are seeking mutual aid and protection from the exploits of a powerful employer.

## II.

## RELEVANT CONTRACT LANGUAGE

The following are quotations of the pertinent parts of the CBA sections identified by Sunrise in the Complaint:

> Section 3.1 (Bulletin Boards): "The Hospital will provide the Union with a lockable bulletin board…located in the Hospital's cafeteria for the posting of Union notices, and five similar boards located [elsewhere in the Hospital]…Employee break rooms and employee lounges' bulletin board space will be respectfully shared by employees, the Union, and the Hospital. No materials will be posted that are critical of any Hospital employee or of any policy relating to patient care or the delivery of patient care at the Hospital…." (ECF No. 11-3, page 8).

Cir. 2008) (quoting *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 617, 89 S. Ct. 1918, 23 L. Ed. 2d 547 (1969)). *See* also 29 U.S.C. § 158(c).

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

Section 3.3 (New Member Orientation): "The Hospital shall allot up to thirty (30) minutes during…general orientation for a brief information presentation by Union Representatives…The parties understand that the purpose of this meeting is to present non-controversial information concerning the Union to the orientees, and that management will not be present during such presentations…." (ECF No. 11-3, page 10).

Section 6.1 (Distribution of Union Literature): "Distribution of union literature on Hospital property will be limited to distributions by Union Staff Representatives and Hospital employees on their non-working time in employee break rooms…Union literature will not be distributed in the cafeteria, lobbies, or parking lots, except as set forth below:" (ECF No. 11-3, page 13). Section 6.1.2: "A copy of the literature being distributed will be delivered to the Director of Labor Relations at the time of distribution. All literature distributed by the Union and/or the Hospital will comply with the provisions of Article 58." (ECF No. 11-3, page 14).

Section 58.1 (Mutual Respect and Commitment): "The Parties agree to conduct their relationship in a manner that reflects mutual respect and a joint commitment to problem-solving, and in any communications they shall focus on the merits of the particular issue in debate, address differences in a positive manner and not engage in personal attacks or make derogatory comments about their respective organizations, affiliates and leadership." (ECF No. 11-3, page 67).

Article 61 (Shared Vision): "The Employer and the Union share a commitment to provide high quality, therapeutic, accessible, affordable healthcare to the communities we serve. The Employer and the Union further agree that they use their best efforts to provide the highest level of patient care and that they will work together to improve the lives of the people and communities they serve by: respecting the inherent value and worth of each person; working together with people who support common values and visions to achieve shared goals; and acting in ways that promote respect for all persons and each other and demonstrate compassion; cultivating the resources entrusted to promote healing and wholeness; and exceeding expectations through teamwork and innovation. Both parties recognize that it is also to their mutual advantage to have efficient and continuous operations of the Hospital in order to provide quality patient care.

Nothing contained in this Article is intended to create any substantive rights, duties, or obligations on the part of either party or to provide evidence of the intent of either party with respect to any substantive provision of this Agreement." (ECF No. 11-3, page 70).

## III.

## GOVERNING LEGAL STANDARDS

A preliminary injunction "is a matter of equitable discretion and is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quotation marks and citations omitted). The following factors are considered by courts when deciding whether to

grant such extraordinary relief: 1) likelihood of success on the merits; 2) whether immediate irreparable injury will be suffered if preliminary relief is not granted; 3) balance of hardships; and 4) advancement of the public interest. *Winter v. N.R.D.C.*, 555 U.S. 7, 129 S. Ct. 365, 374-76, 172 L. Ed. 2d 249 (2008).

In this case, the normal "clear showing" standard imposed by the Ninth Circuit must be superseded and the Court must hold Sunrise to a higher standard and demand a higher quantum of proof for several reasons. There is an overlap between the preliminary and permanent injunctions that Sunrise seeks. Both seek to prohibit the use, printing, or distribution of "images or language targeting and/or portraying Plaintiff its affiliate organizations, and leadership in a similar fashion" to that described in the Complaint. *See* ECF No. 1, Pages 8–9, Sections F(1) and (3). Therefore, granting the preliminary injunction would "provide the movant substantially all the relief he may recover after a full trial on the merits" so Sunrise has an "even heavier burden of showing that the four factors…weigh *heavily and compellingly* in movant's favor before…an injunction may be issued." *Allen v. Cty. of Lake*, 71 F. Supp. 3d 1044, 1050 (N.D. Cal. 2014) (quoting *SCFC ILC, Inc., v. Visa USA, Inc.*, 936 F.2d 1096, 1098-1099 (10th Cir. 1991) (emphasis added)).

Furthermore, Sunrise seeks an order enjoining speech that has not yet occurred. *See* Complaint (ECF No. 1) at Page 8, ¶ F(1)(a). Injunctions forbidding future "speech activities…are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993). Sunrise must therefore overcome the "heavy presumption" that the injunctions it seeks will not be valid. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971); *see also Columbia Broad. Sys., Inc. v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 729 F.2d 1174, 1183 (9th Cir. 1984) ("under our constitutional system prior restraints, if permissible at all, are permissible only in the most extraordinary of circumstances").

The Motion for Preliminary Injunction must be denied as a matter of law because the United States Supreme Court has held that extraordinary circumstances are not presented in

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

cases like this one. *See Org. for a Better Austin*, 402 U.S. at 419 ("No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court"); *see also Children's Vill. v. Greenburgh Eleven Teachers' Union Fed'n of Teachers, Local 1532*, 258 A.D.2d 610, 611, 685 N.Y.S.2d 754, 755 (App. Div. 2nd Dept. 1999) (denying a party's motion seeking a prior restraint in the form of preliminary and permanent injunctions intended to prevent a union from communicating with the potential donors of the party) (citing and quoting *Org. for a Better Austin*, 402 U.S. at 419).

If that were not enough, Sunrise must also overcome other precedents favoring Local 1107's right to exercise protected speech rights and disfavoring Sunrise Hospital's effort to silence such speech. For example, "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding [free speech] principles." *AP v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("[T]he public interest favors the exercise of [free speech] rights.").

## IV.

## ARGUMENT

As mentioned above, it appears that Sunrise is using this lawsuit to achieve goals it has not disclosed. It hopes to obtain orders that would give it an advantage in labor negotiations. Regardless, Sunrise cannot overcome the "heavy presumption" that the injunction it seeks is not valid, nor can it prove that the injunctive relief factors weigh heavily and compellingly in its favor.

**A. The Court must rule on Local 1107's Motion to Dismiss before considering the Motion for Preliminary Injunction.**

As a preliminary matter, if the Court chooses to grant Local 1107's Motion to Dismiss Complaint (ECF No. 12), which questions the Court's jurisdiction and challenges Sunrise's attempt to plead a plausible claim for breach of contract, the Court need not consider Sunrise's Motion for Preliminary Injunction. "Before evaluating the availability of preliminary relief, the

Court must first determine that it may properly exercise jurisdiction over the action…[a] Motion to Dismiss under Rule 12(b)(1) therefore must be decided before [a] Motion for Preliminary Injunction may be considered." *Rosenkrantz v. Inter-American Dev. Bank*, Civil Action No. 20-3670 (BAH), 2021 U.S. Dist. LEXIS 65482, at *23-24 (D.D.C. Apr. 5, 2021) (citing and quoting *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 203 (D.D.C. 2011) and *Am. Hosp. Ass'n v. Hargan*, 289 F. Supp. 3d 45, 55 (D.D.C. 2017) (internal quotation marks omitted)); *see also Wankowski v. Taylor Bean & Whitaker Mortg. Corp.*, No. 2:10-CV-538 JCM (PAL), 2010 U.S. Dist. LEXIS 131798, at *8 (D. Nev. Dec. 13, 2010) (denying injunction because, "[b]ased on the court's finding that the claims herein must fail, it cannot be established that the plaintiffs have a 'likelihood of success on the merits'").

Furthermore, injunctions cannot be ordered in cases based on contract breaches unless the relevant contract language is sufficiently clear. *See Sprint Corp. v. DeAngelo*, 12 F. Supp. 2d 1188, 1194 (D. Kan. 1998) (because the contract at issue was ambiguous, the plaintiff was necessarily unable to prove "a substantial likelihood of success on the merits" as required for issuance of an injunction); *SportsChannel Am. Assocs. v. Nat'l Hockey League*, 186 A.D.2d 417, 418, 589 N.Y.S.2d 2, 3 (App. Div. 1st Dept. 1992) (refusing to grant an injunction because the plaintiff had failed "to demonstrate that it is likely to succeed on the merits, the terms of [the contract] being too imprecise and ambiguous to warrant that conclusion" and noting that "[i]njunctive relief is inappropriate when sought upon contractual language that leaves the rights of the parties open to doubt and uncertainty."). Because Local 1107's Motion to Dismiss challenges both jurisdiction and Sunrise's ability to enforce any of the relevant contract provisions, many of which Local 1107 has shown to be ambiguous, the Court should decide the Motion to Dismiss (ECF No. 12) before considering the Motion for Preliminary Injunction.

**B. Sunrise is unlikely to succeed on the merits.**

Sunrise is unlikely to succeed on the merits for at least three primary reasons. First, there is no evidence that the "Defendant edition" of the CBA was distributed by Local 1107 to persons other than its own members (i.e., Local 1107 did not distribute the CBA to the public).

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

Second, Sunrise wants the Court to issue an order restraining Local 1107 from exercising free speech rights that are protected by law. Such orders are presumed to be invalid. Third, the CBA provisions on which Sunrise bases its sole claim do not clearly prohibit the complained-of acts attributed to Local 1107.

**1. Sunrise has not proved the CBA was distributed to the public.**

Based on Sunrise's motion, one might be left with the impression that by placing covers on the Parties' CBA with small photos depicting union members encouraging "HCA Hospitals" to "Put People Over Profits!" Local 1107 had made a singularly damning, reputation-destroying, public accusation against Sunrise. But this is simply untrue. Although Sunrise is one of many HCA hospitals, Sunrise is not mentioned by name in this statement. Curiously, Sunrise goes to great lengths in describing its monolithic influence in Las Vegas only to complain that a benign "HCA Healthcare: Put Patients Over Profits" statement threatens its medical empire. There is more to this lawsuit than Sunrise is telling.

By filing its Motion for Preliminary Injunction, Sunrise seeks to stifle free expression of ideas by the members of Local 1107 and by Local 1107 itself. Statements and communications of the type that Sunrise seeks to prohibit are routinely expressed in labor negotiations, other similar forms of advocacy, public policy commentary, and news reporting. *See, e.g.*, Exhibit F (website captures from various sources).[2] And even if the Court were persuaded that the

---

[2] *People Over Profits: A Values-Based Movement for Declining Health*, NATIONAL PARTNERSHIP FOR HEALTHCARE AND HOSPICE INNOVATION, https://www.hospiceinnovations.org/in-the-news/people-over-profit-2/ (last visited Aug. 5, 2024).

Community Catalyst, *Why People Should Matter Over Profit*, https://communitycatalyst.org/work/building-power-with-communities/people-over-profit/ (last visited Aug. 5, 2024).

Claire Andre & Manuel Velasquez, *A Healthy Bottom Line: Profits or People*, SANTA CLARA UNIVERSITY, https://www.scu.edu/ethics/focus-areas/bioethics/resources/a-healthy-bottom-line-profits-or-people/ (last visited Aug. 5, 2024).

*Tell our Politicians to take the Patients over Profits Pledge*, PATIENTS OVER PROFITS, https://patientsoverprofits.org/ (last visited Aug. 5, 2024).

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

statements "HCA Healthcare: Put Patients Before Profits!" and "Respect us. Pay us. Protect us. Unions for all" could seriously impact Sunrise's reputation, there simply is no evidence that Local 1107 ever distributed the "Defendant edition" CBAs to persons other than Local 1107 union members. *See* ECF No. 11-2 at ¶ 12 (Rietz declaration confirming that the CBA was distributed to "represented bargaining unit Sunrise employees"). Because there is no evidence suggesting that the CBA was distributed publicly, but rather Sunrise's own evidence clearly demonstrates it was **not** so distributed, there is no threat of loss of reputation among the public. At least, there can be no loss for which Local 1107 could be held responsible. As a result, Sunrise is not entitled to an order requiring Local 1107 to "collect and destroy" copies of the CBA.

### 2.  Sunrise seeks a heavily disfavored prior restraint order.

As noted above, a preliminary injunction is already considered an extraordinary remedy, even more so when the party seeks an injunction in hopes to silence another. Courts are typically extremely sensitive to matters of speech and are loath to enjoin speech. *Sindi v. El-Moslimany*, 896 F.3d 1, 35 (1st Cir. 2018) (courts must properly analyze and determine that "less intrusive remedies [are] unavailable before injunctive relief can be considered" and in cases involving speech, and injunctions must be "as narrowly tailored as possible to avoid censoring protected speech.").

> "With very few exceptions, the remedy for [unwanted speech] is a damages action after publication, not a preliminary injunction. *Allen v.*

---

*Patients Over Profits: The Federal Government Negotiates Drug Prices*, COMMONWEAL, https://www.commonwealmagazine.org/aca-health-care-medicare-big-pharma-biden-editorial (last visited Aug. 5, 2024).

*Kathy Oubre, Policymakers should support patients over profits in Louisiana*, LOUISIANA ILLUMINATOR, https://lailluminator.com/2024/04/29/patient-profit/#:~:text=With%20Senate%20Bill%20347%2C%20Louisiana,health%20care%20costs%20in%20Louisiana (last visited Aug. 5, 2024).

*The health care industry must put patients over profits!*, NATIONAL NURSES UNITED, https://go.nationalnursesunited.org/sign/home-all-alone/ (last visited Aug. 5, 2024).

CHRISTENSEN JAMES & MARTIN, CHTD.

7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117

PH: (702) 255-1718 § FAX: (702) 255-0871

> *The Ghoulish Gallery*, 2007 U.S. Dist. LEXIS 37514, 2007 WL 1555739, at *3 (S.D. Cal. May 23, 2007). Plaintiff has not demonstrated that its case is exceptional. Its Motion for Preliminary Injunction is therefore denied.

*Living Vehicle, Inc. v. Kelley*, No. 2:22-cv-06226-RGK-AS, 2023 U.S. Dist. LEXIS 37872, at *24-25 (C.D. Cal. Jan. 20, 2023).

It is well settled that the loss of First Amendment freedoms constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689, 49 L. Ed. 2d 547 (1976). Similar considerations operate in the context of the bill of rights found in the Labor-Management Reporting and Disclosure Act, which is aimed at protecting in the union context freedoms analogous to those that the first amendment safeguards. *See Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981). Such concerns regarding the censoring of speech are of primary importance in this matter because, if the Court grants Sunrise the injunction it seeks, the Court will be improperly trampling on free speech rights that belong to Local 1107 and its members. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

"The remedy for…speech we do not like, is more speech, not enforced silence…." *Animal Legal Def. Fund v. Otter*, 118 F. Supp. 3d 1195, 1209 (D. Idaho 2015) ("Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when…content-based mandates" are imposed) (citing and quoting *Whitney v. California*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring)). Courts are extremely hesitant to grant private individuals or companies protection from the speech of others. "No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 1578 (1971); *see also Parrot Pointe Marine, Inc. v. Sandow*, 2022 IL App (5th) 210285-U, ¶ 22 (Ill. 5th Dist. Ct. of App., May 16, 2022) ("Although any negative comments against…the plaintiff's business practices might be offensive and could result in loss of business, the interest of an individual being free from public criticism of his business practices

does not warrant the use of the court's injunctive power. Thus, we find that the court's prior restraint imposed on the defendant's speech was not the least restrictive means of attaining its goal as the court's injunctive power should not be used to silence criticism of others' business practices.") (internal citation omitted).

Here, Sunrise finds it uncomfortable to be the subject of speech routinely used in labor negotiations, so it has asked for injunctions prohibiting Local 1107, a labor organization, from using such speech. Sunrise seeks to control Local 1107 and deprive the Local of perhaps its most powerful resource—the ability to communicate lawful ideas in support of union members' right to bargain collectively or to seek "other mutual aid or protection," as explicitly authorized by 29 U.S.C. § 157. But Sunrise has identified no provision of the CBA that requires disputes between the Parties to remain private. And if such a provision did exist, Sunrise would have breached it by filing its Complaint in this case. Sunrise cannot reasonably seek to keep private the CBA covers about which it complains through this decidedly public lawsuit. For these reasons and others, this case is remarkably similar to *St. Peter v. United Staff Nurses' Union Local 141*, No. C08-5639RJB, 2009 U.S. Dist. LEXIS 12643 (W.D. Wash. Feb. 19, 2009). In *St. Peter*, the court denied a hospital's request for injunctive relief intended to prevent a union from posting an arbitration decision on the union's website, as follows:

> Although the hospital does not label its request as such, its attempt to get this Court to prohibit the union's posting of the arbitrator's opinion and award on the union's website will be construed as a form of injunctive relief.
>
> Courts considering requests for injunctions have consistently recognized the significant public interest in upholding First Amendment principles. *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002). There is a heavy presumption against the constitutional validity of a prior restraint on expression, such as the one the hospital seeks here. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971) (holding that preliminary injunction constituted an impermissible prior restraint on speech in violation of the First Amendment). No prior decisions support the claim that the interest of an individual company in being free from public criticism of its business practices warrants use of the injunctive power of a court. *See Organization for a Better Austin*, at 420.

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

The hospital has made no showing that a restraint on speech is warranted here. It does not cite to any authority supporting such an order. There is no provision in the CBA that requires disputes be kept out of the public realm. Even if one of the underlying purposes of using an arbitration clause is for the private resolution of disputes, the hospital has voluntarily given up its opportunity to keep these matters private. It has chosen to file this case, and the arbitrator's opinion and award are now a part of the public record. The hospital has provided no basis upon which to issue an order prohibiting the union's publishing the rulings of this Court, or any other portion of the public record. To the extent that the hospital seeks an order preventing the union from posting the arbitrator's opinion and award on its website, or in any other manner from publishing these materials, the motion should be denied.

*St. Peter v. United Staff Nurses' Union Local 141*, 2009 U.S. Dist. LEXIS 12643 at *33-34.

Speech regarded as a threat to one's business interests is not a proper basis on which to seek a prior restraint. *See Living Vehicle, Inc. v. Kelley*, No. 2:22-cv-06226-RGK-AS, 2023 U.S. Dist. LEXIS 37872, at *24 (C.D. Cal. Jan. 20, 2023) (citing *Near v. Minn, exrel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 75 L. Ed. 1357 (1931) and ruling that the plaintiff was "badly mistaken" to imply that threats to its business interests justified a prior restraint; examples of threats which might justify such extreme measures include "statements damaging to military recruiting in times of war, statements that reveal critical military information during a war, or a statement that incites violence—not accusations of business impropriety…"). Sunrise Hospital is similarly "badly mistaken" in this case, and its Motion for Preliminary Injunction must be denied.

### 3. The CBA sections Sunrise relies upon do not even clearly (let alone heavily and compellingly) support the relief sought.

If, despite the concerns identified above, the Court is somehow persuaded that Sunrise may nonetheless be able to prove itself "likely to succeed on the merits," the Court must analyze the Parties' CBA. As shown herein, Local 1107 respectfully submits that the text of the CBA does not prohibit the conduct about which Sunrise has complained. Stated another way, the relief sought is unavailable as a matter of law unless Sunrise proves that the CBA sections on which it has focused weigh in its favor *heavily and compellingly* and that their text *clearly* supports its motion. *See Sprint Corp. v. DeAngelo*, 12 F. Supp. 2d 1188, 1194 (D. Kan. 1998)

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

(because the contract at issue was ambiguous the plaintiff was necessarily unable to prove "a substantial likelihood of success on the merits" as required for issuance of an injunction).

Because Sunrise's claim is based on (at best) wildly stretched interpretations of the CBA, Sunrise cannot make a "clear showing" that it is entitled to preliminary injunctive relief, let alone that the injunctive relief factors weigh *heavily and compellingly* in its favor. Sunrise concedes in its motion that a contract must be interpreted consistent with the parties' mutual intentions, which may only be ascertained from their "plainly expressed intent" when the words of the contract are clear and unambiguous. ECF No. 11 at pg. 7. Insofar as they relate to Local 1107's use of covers on the internally distributed "Defendant edition" of the CBA, the CBA provisions are far from clear.[3] It therefore follows that injunctive relief is inappropriate because the contract language is too imprecise to show that Sunrise is likely to succeed on the merits. *See Sprint Corp.*, 12 F. Supp. 2d at 1194 (D. Kan. 1998); *see also SportsChannel*, 186 A.D.2d 417, 418, 589 N.Y.S.2d 2, 3 (App. Div. 1st Dept. 1992).

CBA Section 3.1 does not apply. Sunrise claims that Local 1107 violated Section 3.1 of the CBA, which addresses only information and items that may be "posted" on "bulletin boards." Sunrise has not alleged that this matter has anything to do with information posted on bulletin boards. There is therefore no rational basis on which to conclude that Section 3.1 of the CBA was violated. Sunrise will be unable to prove a breach of CBA Section 3.1.

CBA Section 3.3 does not apply. Section 3.3 of the CBA prohibits presentation of "controversial information during new employee orientation" meetings. Sunrise has offered no reason to believe that any relevant conduct or speech took place "during new employee orientation" meetings. Furthermore, the CBA provides no definition or examples of controversial information. Instead, Sunrise's claim is admittedly based on its own unilateral

---

[3] The many ways in which the relevant CBA language is ambiguous (or otherwise inapplicable or unenforceable) will be dealt with more briefly in this Response than in Local 1107's Motion to Dismiss Complaint (ECF No. 12), Sections III(B)(1, 2, 3, 4, 5, and 6) of which are hereby incorporated by reference.

views about which types of speech should be considered controversial. *See* ECF No. 1 at ¶ 22 (alleging that Local 1107 should have known what "would be considered controversial and offensive *to Plaintiff*") (emphasis added). Local 1107 did not agree to appoint Sunrise as the party who decides what Local 1107 may say or do, nor could it. Local 1107 submits that (as more extensively explained in its Motion to Dismiss) Sunrise cannot unilaterally determine what information is controversial for purposes of the CBA. *See, e.g.*, *United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998) ("We have no doubt that standing alone, the term 'controversial' vests the decision-maker with an impermissible degree of discretion."). Sunrise will be unable to prove a violation of CBA Section 3.3.

CBA Sections 6.1 and 6.1.2 do not apply. Sections 6.1 and 6.1.2 of the CBA state rules pertaining to the "distribution of *Union literature*" "on Hospital property," including locations such as "break rooms and employee lounges…bulletin boards…cafeteria, lobbies, or parking lots." The CBA was negotiated, approved, and adopted by both parties. It is therefore not "Union literature." And even if it were, Sunrise could not prohibit its distribution on hospital property. The only enforceable requirement in Section 6.1.2 is that a copy of the literature "will be delivered to the Director of Labor Relations at the time of the distribution." (emphasis added). Contrary to the Hospital's assertion, Local 1107 did provide a copy of the literature to be distributed on the dates they were distributed. *Compare* Rietz Declaration (ECF No. 11-2) at ¶ 11 *with* Exhibit G. As shown in Exhibit G, a photocopy of the "Defendant edition" of the CBA was delivered to the Director of Labor Relations (Joan Kane) on June 7, 2024 and June 26, 2024, the days on which Local 1107 distributed the CBAs to its members. O'Connor Declaration at ¶ 6. Accordingly, there was no breach of Sections 6.1 and 6.1.2.

Not only does CBA Article 61 not apply, but it also cannot be enforced in the manner requested by Sunrise. Sunrise suggests that Article 61 of the CBA (Shared Vision) was violated. But near the end of Article 61, the following language appears: "Nothing contained in this Article is intended to create any substantive rights, duties, or obligations on the part of

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

either party or to provide evidence of the intent of either party with respect to any substantive provision of this Agreement." In other words, the Parties agreed that Section 61 is irrelevant for purposes of determining whether any substantive violation of the CBA has occurred. Therefore, nothing stated in CBA Article 61 may be relied upon to support Sunrise's Motion for Preliminary Injunction. But even if the Court were to ignore the limiting language from the end of Article 61 (as Sunrise has), the earlier parts on which Sunrise hopes to base its breach of contract claim would still be unenforceable because they are mere aspirational statements. *See, e.g.*, *Konchar v. Pins*, 989 N.W.2d 150, 158 (Iowa 2023), citing *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992) (applying Illinois law) (statements like "Shared Vision" and language expressing goals like "Keep each other informed," and "Support each other's success," are informal statements of "shared aspirations to improve a working relationship" which "are too vague to be enforceable as contract provisions").[4] The same is true of the "Shared Vision" statement included in Article 61 of the Parties' CBA, in which they state a "share[d] commitment" to "promote respect" and use their "best efforts" while "working together" with those who share "common values and visions" to "exceed[] expectations through teamwork and innovation." Sunrise is *very unlikely* to prove a violation of Article 61.

CBA Section 58.1 does not apply and Sunrise cannot enforce it as requested. Sunrise claims that Local 1107 violated section 58.1 of the CBA, which states the ideal that Local 1107 and Sunrise will "conduct their relationship in a manner that reflects mutual respect" while still being able to address issues "in debate." This "mutual respect" language is both aspirational in nature and imprecise. It is therefore unenforceable for the same reasons that apply to Article 61 and the other CBA sections discussed above. But even if the language of Section 58.1 were

---

[4] "Courts regularly hold that aspirational statements in contracts are not enforceable promises." *Local 698-C of the Int'l Chem. Workers Union Council of the UFCW v. Momentive Performance Materials, L.L.C.*, No. 5:22-CV-317, 2023 U.S. Dist. LEXIS 117308, at *16 (N.D.W. Va. May 4, 2023); *see also Shea v. State*, 510 P.3d 148, 151 (Nev. 2022) (affirming order dismissing complaint to enforce aspirational clauses found in the Nevada Constitution).

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

enforceable, it would govern only the ways in which the Parties "conduct their relationship" with each other. The language of Section 58.1 does not purport to regulate the Hospital's internal communications regarding actions taken by Local 1107, nor does Section 58.1 limit Local 1107 from sharing its unvarnished thoughts with union members regarding the Hospital's actions and decisions. Such forms of communication are needed for the Parties to engage in meaningful "debate" with each other, as Section 58.1 itself envisions. Therefore, Section 58.1 cannot reasonably be interpreted as Sunrise has requested.

Aggressive language is sometimes used in such debates, especially when unions are involved. *See Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 283, 94 S. Ct. 2770, 2781 (1974) ("federal law gives a union license to use intemperate, abusive, or insulting language *without fear of restraint* or penalty if it believes such rhetoric to be an effective means to make its point.") (emphasis added). Yet "restraining" Local 1107 from speaking freely with its own membership is precisely what Sunrise has asked this Court to do. *See* Complaint (ECF No. 1) at Pages 8–9, Sections F(1) and (3). Because Local 1107 was presumptively authorized to use photos depicting truly intemperate language but instead chose to use photos stating, "HCA Healthcare: Put Patients Before Profits!" the conclusion that the Court should draw is that Local 1107 was using its "best efforts" to show respect to Sunrise Hospital.

Given that unions and employers generally have the right to freely communicate, any contract provision purporting to limit Local 1107's ability to communicate with its members, whether through the use of photos or through other means, would necessarily have to be precise and explicit. General aspirational statements regarding the way the Parties intend to conduct themselves with "mutual respect" cannot be used to provide detail to other CBA sections that lack it. "[A] promise that is vague, general or of indeterminate application is not enforceable." *Aguilar v. Int'l Longshoremen's Union Local #10*, 966 F.2d 443, 446 (9th Cir. 1992). Furthermore, a party may not draw inferences from vague or indefinite contract terms in an effort to "transform them into an enforceable promise." *Id*. Sunrise will be unable to prove a

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE, LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

violation of CBA Section 58.1. None of the CBA sections identified by Sunrise may be interpreted or enforced as it has requested. The Motion for Preliminary Injunction must be denied.

### C. Sunrise is not likely to suffer harm.

The declaration attached to Sunrise's motion seeks to show that Sunrise will suffer harm as a result of Local 1107's distribution of the "Defendant edition" CBA to its members. But as a matter of law, the members are permitted to learn Local 1107's positions. *Murphy v. Local Union No. 18, Etc*, No. C 73-1336, 1978 U.S. Dist. LEXIS 16537, at *197 (N.D. Ohio July 18, 1978) ("[D]uly elected [union] officials have a right and a responsibility to exercise the powers of their office and to advise and report to the membership on issues of general concern."). Therefore, the distribution of the CBA to union members cannot constitute harm suffered by Sunrise.

Furthermore, Sunrise has alleged no facts suggesting that the harm suffered (if any) will be "irreparable." *See, e.g.*, *Cohen v. Mylife*, 2019 Cal. Super. LEXIS 91354, *8 (San Diego Sup. Ct., June 6, 2019) ("The declarations submitted by Plaintiff speculate that Defendant's business practices results in damage to reputations. However, there is no evidence of such damages, e.g., lost business opportunities."). In its Motion, Sunrise relies upon *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) in arguing that loss of reputation or goodwill can amount to irreparable harm. At that time, the Ninth Circuit held in *Rent-A-Center* that a "*possibility* of harm" was sufficient to meet the standard of showing irreparable harm for purposes of a motion for preliminary injunction. *Id.* at 602. However, the U.S. Supreme Court has since ruled that the "'possibility' standard is too lenient." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). Instead, the standard requires plaintiffs seeking a preliminary injunction "to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). Sunrise has not presented facts that would demonstrate a likelihood of harm; instead, it has based its entire argument on the "possibility" of such harm. The absence of evidence presented by Sunrise in this Motion lends credence to

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE, LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

Local 1107's belief that the intent behind this lawsuit is to gain an advantage in the labor negotiations related to the professionals bargaining unit.

Sunrise has also presented no evidence that Local 1107's actions have led to disruptions to patient care. The cases cited by Sunrise in support of this assertion are all inapplicable: two of the cases (*Rodde* and *Harris*) concern a hospital facing shutdown, and the third case (*Murphy*) concerns physicians who were being barred from practicing in a certain hospital. Sunrise has alleged no facts that support Local 1107's CBA covers present any such barriers to patient care. Because the Supreme Court has rejected the lenient "possibility" standard, and no facts have been presented showing negative effects on patient care, Sunrise has failed to meet its burden of showing the likelihood of irreparable harm, and its Motion should be denied.

**D. The balance of hardships favors Local 1107.**

Orders granting injunctive relief must be based on admissible evidence, and arguments are not evidence. *See Klein v. City of Laguna Beach*, 381 F. App'x 723, 726 (9th Cir. 2010) (citing *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999)). Sunrise bears the burden of proof to show harm, and its evidence is lacking. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("To qualify for injunctive relief, the plaintiffs must establish that 'the balance of equities tips in [their] favor.'") (quoting *Winter*, 555 U.S. at 20).

In its Motion addressing this factor, Sunrise begins with a conclusory allegation that Local 1107 has breached the contract, and its argument stops there. Sunrise makes no assertion regarding its own hardship if the injunction is not granted, let alone the extent to which Local 1107's hardship is purportedly of lesser weight or importance. To "balance the hardships," the Court must have a sense of what those hardships are before determining the weight of the damage that could occur should an injunction be withheld or issued. *Id.* ("[T]he district court has a duty...to balance the interests of all parties and weigh the damage to each.") (internal quotation marks omitted). The Plaintiff has not met its burden, and its bare conclusion that the balance of hardships weighs "strongly" in Sunrise's favor is necessarily based on speculation.

On the other hand (or the other side of the scale balancing hardships, as it were), Local 1107 would suffer significant harm if the Court enters a preliminary injunction in Sunrise's favor. Local 1107 would be deprived of its rights of free speech and engaging in dialogue, and Sunrise will enjoy unprecedented ability to control how and to whom Local 1107 communicates. This injunction would effectively permit Sunrise to consider all Union speech repugnant to the relationship and will likely lead to the inability to effectively organize employees in a manner otherwise permitted by law.

Based on the evidence presently before the Court, there are two primary conclusions that may properly be drawn when weighing the hardships. First, if the injunction sought by Sunrise is denied, Sunrise will continue to operate without disruption, even though members of Local 1107 will likely display signs during labor negotiations, as is their right. Notably, Sunrise has not alleged that the public display of such signs has caused harm. The harm alleged by Sunrise relates only to the placement of photos on the covers of the CBA depicting such signs that were admittedly only "distributed to represented bargaining unit Sunrise employees." *See* Rietz Declaration (ECF No. 11-2) at ¶ 12. Second, if the requested injunction is granted, the Court will unquestionably hamper Local 1107's operations by empowering the Hospital with the right to regulate Local 1107's speech through prior restraint. Local 1107 believes this would violate the free speech rights recognized and protected by the National Labor Relations Act.[5] Indeed, employees are empowered by law to join for mutual aid or protection. 29 U.S.C. § 157. Local 1107 and its members would be catastrophically harmed if the Court grants Sunrise's desire to strip them of that right.

It appears beyond dispute that Sunrise is attempting to use the CBA in a manner that the Parties never intended. Local 1107 did not enter into the CBA intending to grant Sunrise the right to regulate or censor Local 1107's speech, and none of the contract sections identified in

---

[5] It is not appropriate for courts to attempt "to delineate precisely the boundaries of the 'mutual aid or protection' clause. That task is for the National Labor Relations Board to perform...." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 568 (1978); *see also* footnote 1 herein.

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE, LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

the Complaint compel a contrary conclusion.[6] The Court must deny the Motion for Preliminary Injunction because there is no evidence showing that continued speech will harm to Sunrise, while Local 1107 will suffer great harm if the Motion is granted. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [free speech rights] for even minimal periods of time, unquestionably constitutes irreparable injury."). The balance of hardships tips decisively in favor of Local 1107.

**E. Enjoining Local 1107 is not in the public interest.**

The slogan depicted in the photos about which Sunrise has complained is perfectly consistent with the public's interest in the delivery of effective medical care, as recognized in Nevada law. *See* NRS 449.2421 (precluding licensing of hospitals in counties with populations of at least 100,000 unless they certify that their "documented staffing plan[s]" are adequate to meet the needs of the patients they serve). This issue is of particular concern to many employees of the Hospital represented by Local 1107, whose continued licensing, credentialing, and ability to work depends on being part of a team that provides adequate medical care, which is dependent on proper patient / staffing ratios. This is the point members of Local 1107 were making when they held signs saying "HCA Healthcare: Put Patients Over Profits!" It cannot be disrespectful to assert that good patient care achieved through proper patient / provider ratios is important when that is what Nevada law already declares.

There is no reason to believe that the continued existence of "Defendant edition" copies of the CBA could undermine public trust because there is no allegation in the Complaint that Local 1107 distributed copies to the public. And even if Sunrise could prove it has suffered harm resulting from public disclosure of the CBA, no facts alleged in the Complaint tie any such harm to Local 1107's actions. Sunrise, not Local 1107, decided to bring the placards to the

---

[6] Sunrise Hospital's reference to *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) is inapposite here. In *Leonard*, the parties crafted a CBA provision restricting speech in a very narrow context concerning payroll-increase legislation, which the Court found to be narrowly tailored to achieve a compelling government interest. Here, no such narrowly-tailored language restricting speech exists in the CBA between Local 1107 and Sunrise.

attention of the public by filing the Complaint. *See, e.g.*, Exhibit H (showing that the Las Vegas Review Journal published an article regarding this lawsuit and the CBA covers at issue soon after the Complaint was filed).[7]

Sunrise argues that enforcing contracts is in the public interest, citing *Onpointe Cmty. Care LV LLC v. Charter Health Holdings, Inc.*, No. 2:22-cv-01235-GMN-DJA, 2023 U.S. Dist. LEXIS 41374 (D. Nev. Jan. 10, 2023). But this argument is insufficient to show that Sunrise is entitled to injunctive relief, as shown by the fact that in the *Onpointe Cmty. Care LV LLC* case the requested injunction was denied, and by the following quotation taken directly from the Court's Order explaining:

> Plaintiffs correctly note that past decisions by this Court have recognized there is a public interest in the enforcement of contracts….Nevertheless, Plaintiffs have neither identified how an injunction will impact non-parties, nor have they explained how it otherwise has the potential to impact the public. Accordingly, the public interest and balance of hardship factors appear largely neutral, given the reach of an injunction is narrow, limited only to the parties, and has little impact on non-parties.

*Id*. at *9-10. Here, the same is true. The requested injunction is aimed only at Local 1107 and would have little to no impact on others. Sunrise also argues that the Motion for Preliminary Injunction should be granted because orderly healthcare is in the public interest. However, Sunrise failed to cite any authority for this proposition, and Local 1107, by creating covers for the CBA between the parties, has not interfered with orderly healthcare in the first place. The placard displayed on the cover demonstrates that Local 1107 supports orderly healthcare. Putting patients over profits obviously constitutes the orderly administration of healthcare. The collective efforts of employees promoting patient care as a priority is also obviously in the public's interest. *Pa. ex rel. Rafferty v. Phila. Psychiatric Ctr.*, 356 F. Supp. 500, 510 (E.D. Pa. 1973) ("Patient care and the administration of the procedures necessary to maintain high

---

[7] McKenna Ross, *'Put people over profits': Las Vegas hospital sues union for protest signs on booklet cover*, LAS VEGAS REVIEW JOURNAL, https://www.reviewjournal.com/business/put-people-over-profits-las-vegas-hospital-sues-union-for-protest-signs-on-booklet-cover-3096548/ (last visited Aug. 16, 2024).

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

quality care is an extremely important interest." (citation omitted)). Local 1107 members who are employed at Sunrise are committed to patient welfare and must be free to advocate for proper patient care, because it is in the public's interest. Conversely, Sunrise's desire to stifle advocacy for proper patient care is not in the public's interest.

In contrast with Sunrise's arguments, which are either unsupported, or which this very Court has previously rejected, Local 1107 has shown that the statements about which Sunrise has complained are consistent with the enacted laws of the State of Nevada, and that "[c]ourts considering requests for preliminary injunctions have *consistently recognized the significant public interest* in upholding [free speech] principles." *AP v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (emphasis added); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("[T]he public interest favors the exercise of [free speech] rights."). Local 1107 and its members seek to continue exercising free speech rights. Sunrise seeks to silence speech. There can therefore be little doubt that the public interest factor weighs heavily in favor of Local 1107.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Court should promptly enter an Order denying Sunrise Hospital's Motion for Preliminary Injunction.

Dated this 16th day of August, 2024.                    CHRISTENSEN JAMES & MARTIN

By: */s/ Daryl E. Martin*
Daryl E. Martin, Esq.
*Attorneys for SEIU Local 1107*

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE., LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

## DECLARATION / CERTIFICATE OF SERVICE

I certify under penalty of perjury under the laws of the United States of America that all statements made by me in this Declaration of Service are true. I am an employee of Christensen James & Martin. On the date it was filed with the Court, I caused a true and correct copy of the foregoing Motion to Dismiss to be served in the following manner:

☒ ELECTRONIC SERVICE: Pursuant to LR IC 4-1 of the United States District Court for the District of Nevada, the above-referenced document was electronically filed and served through the Notice of Electronic Filing automatically generated by the Court.

☐ OVERNIGHT COURIER: By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below at their last-known mailing address.

☐ EMAIL: By sending the above-referenced document via email to those persons listed below at the email address that the person has registered with the court's electronic-filing system or has otherwise consented to use in writing:

N/A

☐ UNITED STATES MAIL: By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known addresses:

N/A

**CHRISTENSEN JAMES & MARTIN**

By:  ___*/s/ Natalie Saville*_____

CHRISTENSEN JAMES & MARTIN, CHTD.
7440 WEST SAHARA AVE, LAS VEGAS, NEVADA 89117
PH: (702) 255-1718 § FAX: (702) 255-0871

**CHRISTENSEN JAMES & MARTIN, CHTD.**
Daryl E. Martin (6735)
Dylan J. Lawter (15947)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Email: dem@cjmlv.com, djl@cjmlv.com
*Attorneys for Nevada Service Employees Union*
*aka SEIU Local 1107*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

SUNRISE HOSPITAL AND MEDICAL
CERNTER, LLC D/B/A SUNRISE
HOSPITAL & MEDICAL CENTER,

      Plaintiff,

v.

LOCAL 1107 OF THE SERVICE
EMPLOYEES INTERNATIONAL UNION,

      Defendant.

CASE NO.:  2:24-cv-01247-CDS-MDC

**INDEX OF EXHIBITS**

| EXHIBIT | DOCUMENT |
|---------|----------|
| A | Declaration of Kevin Patrick O'Connor |
| B | Previous CBA Cover with Closeup |
| C | June 5, 2023 Email with Attachments |
| D | June 29, 2023 Email with Attachments |
| E | Bargaining Order issued by the National Labor Relations Board |
| F | Samples of Website Captures from Various Sources |
| G | Emails dated June 7, 2024 and June 26, 2024 with Attachments |
| H | Las Vegas Review Journal Article Regarding Lawsuit |

# EXHIBIT A

## Declaration of
## Kevin Patrick O'Connor

**CHRISTENSEN JAMES & MARTIN, CHTD.**
Daryl E. Martin (6735)
Dylan J. Lawter (15947)
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
Email: dem@cjmlv.com, djl@cjmlv.com
*Attorneys for Nevada Service Employees Union*
*aka SEIU Local 1107*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

SUNRISE HOSPITAL AND MEDICAL CERNTER, LLC D/B/A SUNRISE HOSPITAL & MEDICAL CENTER,

Plaintiff,

v.

LOCAL 1107 OF THE SERVICE EMPLOYEES INTERNATIONAL UNION,

Defendant.

CASE NO.:  2:24-cv-01247-CDS-MDC

**DECLARATION OF KEVIN PATRICK O'CONNOR IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

KEVIN PATRICK O'CONNOR, under penalty of perjury, declares as follows:

1.     I am over the age of 18 and have personal knowledge of the facts stated herein, except as to those matters which are stated upon information and belief, and as to those matters, I believe them to be true. I am competent to testify to the same and would so testify if called upon as a witness.

2.     I am an employee of Nevada Service Employees Union, aka Service Employees International Union, Local 1107, which was named as a Defendant in the above entitled case as Local 1107 of the Service Employees International Union.

3.     I am currently employed as Local 1107's Organizing Coordinator, and I have been in that role since July 2022.

4.     Local 1107 created copies of the collective bargaining agreement ("CBA") containing covers with photos of bargaining unit members.

-1-

5.      In its Complaint and Motion for Preliminary Injunction, Sunrise has taken issue with certain photos on the covers of the CBA containing the following language: "Respect us. Pay us. Protect us. Unions for all" and "HCA Healthcare: Put Patients Over Profits!"

6.      On both June 7, 2024 and June 26, 2024, a representative from Local 1107 sent an email to Joan Kane, the Director of Labor Relations, informing the Hospital of its intent to distribute union literature. Attached to both emails was a photocopy of the cover of the CBA.

7.      True and correct copies of the June 7, 2024 and June 26, 2024 emails and their respective attachments are attached to the Response to Plaintiff's Motion for Preliminary Injunction ("Response") as Exhibit G.

8.      The CBA with covers was given to members of the bargaining unit as well as Local 1107 stewards, to enable them to perform their function of contract administration and enforcement.

9.      This is not the first time Local 1107 has distributed copies of the CBA entered into with Sunrise Hospital containing covers bearing photos with messages similar to those now disputed by Sunrise.

10.      Local 1107 has done the same thing with the previous CBA.

11.      A true and correct copy of the CBA with a union-made cover that was distributed previously is attached to the Response as Exhibit B.

12.      The previous CBA with a union-made cover contained language such as "Respect us, Protect us, Pay us" and "HCA Profits 2020-$3.75 Billion (up 7% from 2019)."

13.      To my knowledge, Sunrise Hospital never complained about the previous CBA with a union-made cover, and certainly not to the point of initiating a lawsuit or seeking an injunction from a court.

14.      On multiple occasions, including but not limited to June 5, 2023 and June 29, 2023, Local 1107 has posted photos similar to those found on the current CBA covers on Sunrise Hospital bulletin boards after notice to the Hospital and without any objection from the Hospital.

-2-

15.   True and correct copies of the emails submitted to Sunrise Hospital containing the bulletin board postings, with their respective attachments, are attached to the Response as Exhibits C and D.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ day of August, 2024.

Kevin Patrick O'Connor

# EXHIBIT B

Previous CBA Cover with Closeup



# AGREEMENT

A COLLECTIVE BARGAINING AGREEMENT BETWEEN **SUNRISE HOSPITAL AND MEDICAL CENTER** AND **SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 1107**

## APRIL 1, 2020 TO MARCH 31, 2023



# EXHIBIT C

## June 5, 2023 Email with Attachments

FW: Union literature

Patrick O'Connor - SEIUnv <POconnor@SEIUNV.org>

Mon 8/5/2024 10:55 AM

To:Brenda Marzan - SEIUnv <BMarzan@SEIUNV.org>
Cc:Fabiola Morales - SEIUnv <fmorales@seiunv.org>

2 attachments (2 MB)
Image.jpeg; Image.jpeg;

Past email sent to Joan

**Patrick O'Connor**
**Organizing Coordinator**
SEIU Local 1107
2250 S. Rancho Drive, #165
Las Vegas, NV 89102
**(702) 934 – 4961**

---

**From:** Patrick O'Connor
**Sent:** Monday, June 5, 2023 11:51 AM
**To:** Kane Joan <Joan.Kane@HCAhealthcare.com>; Snyder Kidist <Kidist.Snyder@hcahealthcare.com>
**Cc:** Fabiola Morales <fmorales@seiunv.org>; Michelle Dominguez <mdominguez@seiunv.org>;
Christopher Hilton <chilton@SEIUNV.org>
**Subject:** Union literature

Hello Joan and Kidist,

Attached is a flyer being distributed and posted at Sunrise Hospital.

**Patrick O'Connor**
Organizing Coordinator
SEIU Local 1107
2250 S Rancho Dr #165
Las Vegas, NV 89102
**(702) 934-4961**



" This is a humongous win because we gained so much and protected so much! And we still have $2.25 million to make adjustments for job classifications that are below market rates. Being involved in bargaining, it's enlightening to realize that we're negotiating against a huge corporation. Without our union voice, HCA would have offered much less or even implemented cuts. The next step is for everyone to sign up to become union members so we can continue to win like this moving forward."

— *Adrian Martinez, RN, Southern Hills*



" Getting involved in our union got this done. Powerful testimonies from all workers got this done. Focusing on patient safety got this done. And we had some really strong, stern advocates on this bargaining team, backed by members who showed up in force. This shows that the more we get active in our union, the more we win."

— *Sean Mosley, Patient Transport Dept., Sunrise and MountainView*



## More details about the agreement and ratification vote coming soon!

Only union members have the right to vote. Reach out for more info:

- Sunrise: Michelle Dominguez at (702) 277-0401.
- Southern Hills and Sunrise: Patrick O'Connor at (702) 934-4961.
- MountainView and Sunrise: Chris Hilton at (702) 690-8046.



**LOCAL 1107**
**SEIU NEVADA**

*Follow us!*    @SEIU1107

# Through Getting Active in Our Union, We Won A Strong Tentative Agreement with a 13.75% Wage Increase, the Largest in Our History!



On May 31, we held a powerful rally and then packed into negotiations with HCA until late at night. Sunrise, MountainView and Southern Hills workers spoke out for our patients, coworkers and families and got widespread news coverage. Because of our unity and activism in our union, we won a strong tentative agreement for a contract which would run until March 31, 2026 and includes:

► 13.75% wage increase over 3 years (5.25%, 4.5%, 4%), effective first full pay period in July.

► $2.25 million for adjustments to bring job classifications that are below market up to competitive rates.

► No major take-aways, including protection of our employer-paid healthcare plan.

► On-call pay increased to $6 per hour for the first time in years.

► Caps on the occurrence point system (Holiday & Enhanced).

► Consistent scheduling practices.

► Sick call out time increased from 2 hours to 3 hours.

► A ban on subcontracting for imaging at MountainView.

► Extra shift differential for Southern Hills.

The **_ONE AND ONLY_** reason we won this contract with these major wage increases is because we got involved in our union and our negotiations. There's strength in numbers, so become a proud union member today and ask all your coworkers to join!

## Sign up to become an SEIU 1107 member by going to bit.ly/hcaunionmembership or pointing your phone camera here:



# EXHIBIT D

June 29, 2023 Email
with Attachments

FW: Union literature

Patrick O'Connor - SEIUnv <POconnor@SEIUNV.org>

Mon 8/5/2024 10:57 AM

To:Brenda Marzan - SEIUnv <BMarzan@SEIUNV.org>

📎 4 attachments (4 MB)

Image.jpeg; Image.jpeg; Image.jpeg; Image.jpeg;

**Patrick O'Connor**
**Organizing Coordinator**
SEIU Local 1107
2250 S. Rancho Drive, #165
Las Vegas, NV 89102
**(702) 934 – 4961**

---

**From:** Patrick O'Connor
**Sent:** Thursday, June 29, 2023 2:12 PM
**To:** Kane Joan <Joan.Kane@HCAhealthcare.com>; Snyder Kidist <Kidist.Snyder@hcahealthcare.com>
**Cc:** Fabiola Morales <fmorales@seiunv.org>; Christopher Hilton <chilton@SEIUNV.org>
**Subject:** Union literature

Hello Joan and Kidist,

The attached items are being posted at Sunrise Hospital.

In solidarity,

**Patrick O'Connor**
Organizing Coordinator
SEIU Local 1107
2250 S Rancho Dr #165
Las Vegas, NV 89102
**(702) 934-4961**

# HISTORIC WIN FOR SUNRISE WORKERS!!



## SEIU 1107 members achieved this major contract victory through our united action!

**97.86% of members voted YES at Sunrise to ratify our contract, which includes:**

- 13.75% wage increase over the 3 year contract, the largest in our history
- $2.25 million fund for market rate wage adjustments
- Protection of our 100% employer-paid health plan
- No major takeaways
- Agreement expires March 31, 2026



**With our united strength, what can we accomplish next?** Become a PROUD UNION MEMBER today by going to bit.ly/hcaunionmembership.

For more info, talk to a member of our Bargaining Team or contact Patrick O'Connor at (702) 934-4961.

   **@SEIU1107**







# EXHIBIT E

Bargaining Order
Issued by the National
Labor Relations Board

UNITED STATES OF AMERICA
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 28**

**SUNRISE HOSPITAL AND**
**MEDICAL CENTER, LLC**

        **Employer**

    **and**                         **Case 28-RC-330552**

**NEVADA SERVICE EMPLOYEES**
**UNION, SEIU LOCAL 1107**

        **Petitioner**

**TYPE OF ELECTION:** STIPULATION

## CERTIFICATION OF REPRESENTATIVE

        An election has been conducted under the Board's Rules and Regulations. The Tally of Ballots shows that a collective-bargaining representative has been selected. No timely objections have been filed.

        As authorized by the National Labor Relations Board, it is certified that a majority of the valid ballots has been cast for

**NEVADA SERVICE EMPLOYEES UNION, SEIU LOCAL 1107**

and that it is the exclusive collective-bargaining representative of the employees in the following appropriate unit:

    **UNIT:**  All full-time and regular part-time Clinical Pharmacist, Medical Technologist, Physical Therapist, Occupational Therapist, Social Worker, and Speech Language Pathologist employees employed by the Employer at its facility located in Las Vegas, Nevada; excluding all other employees, office clerical employees, office professional employees, Midnight Charge Pharmacists, Lead Physical Therapists, Lead Occupational Therapists, managerial employees, confidential employees, guards, and supervisors as defined in the Act.



Signed at Phoenix, Arizona on the 23rd day of January, 2024.

**/s/ Cornele A. Overstreet**
Cornele A. Overstreet
Regional Director, Region 28
National Labor Relations Board

Attachments
1.    Notice of Bargaining Obligation
2.    Notice of Federal Mediation and Conciliation Services for
    Initial Contract Bargaining

cc:    Federal Mediation and Conciliation Services

## NOTICE OF BARGAINING OBLIGATION

In the recent representation election, a labor organization received a majority of the valid votes cast.  Except in unusual circumstances, unless the results of the election are subsequently set aside in a post-election proceeding, the employer's legal obligation to refrain from unilaterally changing bargaining unit employees' terms and conditions of employment begins on the date of the election.

The employer is not precluded from changing bargaining unit employees' terms and conditions during the pendency of post-election proceedings, **as long as** the employer (a) gives sufficient notice to the labor organization concerning the proposed change(s); (b) negotiates in good faith with the labor organization, upon request; and (c) good faith bargaining between the employer and the labor organization leads to agreement or overall lawful impasse.

This is so even if the employer, or some other party, files objections to the election pursuant to Section 102.69 of the Rules and Regulations of the National Labor Relations Board (the Board).  If the objections are later overruled and the labor organization is certified as the employees' collective-bargaining representative, the employer's obligation to refrain from making unilateral changes to bargaining unit employees' terms and conditions of employment begins on the date of the election, not on the date of the subsequent decision by the Board or court.  Specifically, the Board has held that, absent exceptional circumstances,[1] an employer acts at its peril in making changes in wages, hours, or other terms and conditions of employment during the period while objections are pending and the final determination about certification of the labor organization has not yet been made.

It is important that all parties be aware of the potential liabilities if the employer unilaterally alters bargaining unit employees' terms and conditions of employment during the pendency of post-election proceedings.  Thus, typically, if an employer makes post-election changes in employees' wages, hours, or other terms and conditions of employment without notice to or consultation with the labor organization that is ultimately certified as the employees' collective-bargaining representative, it violates Section 8(a)(1) and (5) of the National Labor Relations Act since such changes have the effect of undermining the labor organization's status as the statutory representative of the employees.  This is so even if the changes were motivated by sound business considerations and not for the purpose of undermining the labor organization.  As a remedy, the employer could be required to: 1) restore the status quo ante; 2) bargain, upon request, with the labor organization with respect to these changes; and 3) compensate employees, with interest, for monetary losses resulting from the unilateral implementation of these changes, until the employer bargains in good faith with the labor organization, upon request, or bargains to overall lawful impasse.

---

[1] Exceptions may include the presence of a longstanding past practice, discrete event, or exigent economic circumstance requiring an immediate response.

**NOTICE OF FEDERAL MEDIATION AND CONCILIATION SERVICES FOR
INITIAL CONTRACT BARGAINING**

As a workplace where employees are now represented by a union, both the employer and union have a number of obligations under the law, including the duty to bargain in good faith. These duties can have a practical impact on the bargaining process, as well as the ongoing labor-management relationship at a worksite.

As you navigate this set of obligations and their resulting impacts, we encourage you to take advantage of the following resources from the Federal Mediation and Conciliation Service (FMCS) (www.fmcs.gov). FMCS is a non-regulatory, independent federal agency, separate from the National Labor Relations Board (NLRB), whose mission is to preserve and promote labor-management peace and cooperation. FMCS services include:

- Skills development training for collective-bargaining negotiation, committee effectiveness, and conflict resolution (available at https://www.fmcs.gov/services/education-and-outreach/skills-development-training/);
- Education on contract administration (available at https://www.fmcs.gov/services/building-labor-management-relationships/); and
- Mediation, if you need additional assistance and support with your initial contract negotiations (available at https://www.fmcs.gov/services/resolving-labor-management-disputes/collective-bargaining-mediation/).

FMCS is a Congressionally funded agency offering support to both unions and employers at workplaces and these FMCS services and resources are provided **at no cost**. FMCS services are customized to the specific needs of employer and union leadership groups and FMCS is available to assist with next steps and/or answer questions that come up throughout an initial collective-bargaining agreement negotiation process, as well as for future stages of a labor-management relationship.

For more information on the full range of FMCS services and how these services can be helpful throughout various stages of the collective bargaining process, see OM 22-08. To discuss the specific needs of your group, please reach out to FMCS via email at initialcontract@fmcs.gov or by phone at (202) 606-8100.

# EXHIBIT F

## Sample of Website Captures from Various Sources



Why people should matter over profit

The U.S. health system does many amazing things, and there are many dedicated, compassionate people who provide excellent care. At the same time, the financial underpinnings of the system prevent most people from gaining and maintaining their optimal health.

Health care in the U.S. is horribly expensive, severely inefficient, and people don't get the care they deserve — all because profits are the priority. Too often, profit trumps community needs, and a tremendous amount of money is funneled to wealthy executives and shareholders at the expense of people and communities.

It's no wonder that the majority of people in the U.S. are unhappy with the health system. The U.S. has some of the most expensive health care in the world with mediocre and grossly unequal health outcomes to show for it. As a result of discrimination, systemically excluded communities — including Black and brown people, Indigenous people, women, LGBTQ+ people, older people, and people with disabilities — are disproportionately harmed.

The effects are both individual (in how people are treated and the impact that has on their health) and structural (in how the system is actually set up and managed). Its impact ripples across entire communities and our country.

# 82%
**of non-profit hospital systems spent less on charity care and community investment than the value of their estimated tax exemptions**

# $18.4 billion
**in tax savings that should have supported the communities they serve**

Take, for example, non-profit hospitals. They make up nearly half of all hospitals in the United States and receive billions of dollars in annual tax breaks.

In exchange for a non-profit status, hospitals are required by law to invest in charity care and community health initiatives. Yet, a 2022 study conducted by the Lown Institute found that 82 percent of non-profit hospital systems spent *less* on charity care and community investment than the value of their estimated tax exemptions. In other words, they raked in $18.4 billion in tax savings that should have supported the communities they serve.

These non-profit hospitals generally behave more like profit-maximizing entities than community-focused care providers.

This isn't an unfortunate outlier — just one in a series of offenses by the health industry, including insurance companies, hospitals, and prescription drug companies.

To name a few more:

| Profit is Prioritized | People are Hurt |
| --- | --- |
| A review of dozens of fraud lawsuits, inspector general audits, and investigations by watchdogs shows how major health insurers exploited Medicare to inflate their profits — by billions of dollars. | "One in five Medicare beneficiaries said that they spend half or more than half of their monthly incomes on healthcare expenses. Those healthcare expenses include premiums, prescription drugs, and other costs not covered through fee-for-service Medicare. However, for over a quarter of Medicare recipients, Medicare premiums were their highest healthcare costs." |
| The health care industry has become increasingly consolidated and powerful. This lack of competition allows the industry to drive up premiums, making care even more expensive for people with insurance. | One-third of insured adults worry about affording their monthly health insurance premium, and 44 percent worry about affording their deductible before health insurance kicks in. |
| For the past two decades, the pharmaceutical and health products industry has spent more than $5 billion in lobbying efforts alone — by far the most of any industry. | About three in 10 (29 percent) of all adults report not taking their medicines as prescribed at some point in the past year because of the cost. This includes about one in five who say they didn't fill a prescription (19 percent) or took an over-the counter drug instead (18 percent), and about one in 10 (12 percent) who say they cut pills in half or skipped a dose. Three in 10 of those who report not taking their medicines say their condition got worse as a result. |
| Private equity, which is designed to generate profit, has dramatically increased its reach into the U.S. health system — buying up physician practices, hospital systems, nursing homes, and dental practices. | When private equity buys a health care company, patients often pay the price. A 2021 study concluded that private equity ownership increases the short-term mortality of nursing home residents by 10 percent: that's more than 20,000 deaths over a 12-year period. This is most likely due to rerouting patient care funding to private equity owners. |

## Follow the money with us

Together, we can expose the corporate interests that drive decisions in our health system, and all the ways prioritizing profit over people's health hurts our communities and country. By following the money trail together, we can better understand — and challenge — the business of the health system today.

## Together, we can turn their profits into investments for *our* communities

Our focused efforts will pressure the health system to shift its enormous financial gains toward more people-first priorities, shaped by community members — not shareholders.

A health system that prioritizes people? Now that makes sense.

**"Even when they're playing the game legally, we are lining the pockets of very wealthy corporations that are not improving patient care."**

Dr. Donald M. Berwick, former administrator of the Centers for Medicare and Medicaid Services, Obama Administration

# Our Approach

- Expose where the money goes, where it doesn't go, and its impact on communities

- Build and share knowledge as a health advocacy and justice community so we all have more clarity about how the health system operates from a financial standpoint — and how to disrupt it

- Launch public awareness and engagement campaigns that bring to life how the health system's profit-driven approach hurts people

- Build coalition power along with community-based organizations and advocates to design roadmaps for change and implement strategies that shift investment to people and communities — especially those hurt most by our system today



# $1 trillion

**invested by private equity into nearly 8,000 health care transactions during the past decade**

Structural challenges behind the high costs in health care include the role of private equity firms and venture capitalists. These groups frequently purchase hospitals or entire health care systems and use business strategies designed to maximize profits. This increases value to shareholders, rather than health care providers and patients.

## Related Project

$\rightarrow$

## Stay Informed

Stay connected with Community Catalyst updates and health news that matters.

Join us

## Donate For Health Justice

Your tax-deductible donation goes towards building a health system rooted in race equity and health justice.

Donate



Copyright © Community Catalyst 2024

    



SANTA CLARA UNIVERSITY
THE JESUIT UNIVERSITY IN SILICON VALLEY

About the Center | Staff

Search »

Search

- Ethics Home Page
- Focus Areas
  - Bioethics
  - Business Ethics
  - Campus Ethics
  - Character Education
  - Government Ethics
  - Leadership Ethics
  - More...
- Publications
  - Ethics Articles
  - Ethics Cases
  - Ethical Decision Making
  - Ethics Blogs
  - Podcasts
  - Center News
  - E-letter/Subscribe
- Events
- Contact Us
- Site Index



Make a Gift Now
Start here

MARKKULA CENTER FOR APPLIED ETHICS

## A Healthy Bottom Line:
## Profits or People?

### By Claire Andre and Manuel Velasquez

In Alameda County, a private hospital turned away a woman in labor because the hospital's computer showed that she didn't have insurance. Hours later, her baby was born dead in a county hospital.

In San Bernardino, a hospital surgeon sent a patient who had been stabbed in the heart to a county medical center after examining him and declaring his condition stable. The patient arrived at the county medical center moribund, suffered a cardiac arrest, and died.

These two hospitals shifted these patients to county facilities not for medical reasons, but for economic ones -- the receiving hospitals feared they wouldn't be paid for treating the patient. These patients simply weren't "good business."

With little public warning, a concern for "good business" has moved to the heart of health care, a sector once relatively insulated from the pursuit of profit that drives the rest of the U.S. economy. Throughout our history, medical institutions have largely been "charitable," nonprofit establishments existing primarily to serve the community. But during the past 20 years, the number of for-profit health care facilities, ranging from national hospital chains affiliated with major academic institutions to local dialysis centers, has grown at a rate exceeding even that of the computer industry.

The ethical implications of the growing commercialization of health care have become a matter of heated controversy. Those favoring the trend toward health care for profit claim that an increased role for entrepreneurs and competition in the delivery of health care will result in a more efficient and effective health care system. For others, the pursuit of profit is antithetical to the values central to medicine.

Opposing the commercialization of health care are those who base their arguments on considerations of justice. They argue that a society as wealthy as ours has a moral obligation to meet the basic needs of all of its members. Every American, rich or poor, should have access to the health care he or she needs. The escalating costs of care and a growing unwillingness of insurance companies to cover these costs, along with government budget cutbacks, have severely restricted access to health care for the poor, the aged, and those with catastrophic health problems. The rise of for-profit health care only exacerbates the growing problem of access to care.

Studies show that the growth of for-profits decreases the availability of health care for "unprofitable" patients. Traditionally, non-profits have financed care for the poor by overcharging paying patients to subsidize services for the poor. For-profits, by refusing to serve nonpaying patients while at the same time taking a great share of paying patients, leave non profits with more of the poor to serve but with fewer paying patients to subsidize their care. Furthermore, by serving only profitable patients and offering only profitable services, for profits are able to generate high revenues, which enables them to charge lower prices for their services and to invest in attractive facilities located in areas convenient to paying patients, both of which create substantial competition for non-profits. As a result, it has become increasingly difficult for non-profits to continue to serve those who can't pay.

Opponents of commercialized health care also argue that for-profit health care institutions do not contribute their "fair share" to society. In view of the benefits health care institutions derive from society, it is unfair for them to refuse to help society serve those who can't afford care or are too costly to treat. All hospitals benefit from government subsidized programs like Medicare and Medicaid. They also profit from medical research and medical education paid for by taxpayers' money. In fairness, hospitals have an obligation to serve society's needy. Investor-owned corporations that turn away patients who can't afford to pay fail to discharge this obligation. Moreover, by not taking their fair share of unprofitable patients, for-profits place an undue burden on nonprofit and public hospitals. It's unjust that the costs of serving these patients should fall more heavily on nonprofit institutions.

Further, critics of health care for profit maintain that all persons have a right to live their lives with dignity. Mixing business with medicine will inevitably lead to abuses that violate patient dignity. A patient is in a vulnerable position, necessarily trusting that the doctor's decisions about his or her medical care will be guided solely by the patient's best interests. But in a system of for-profit health care, doctors will become subject to the control of lay managers accountable to share-holders whose primary aim is making a profit. Such hospitals will encourage doctors to promote profit-producing drugs, surgeries, tests and treatments. And, medical treatments and counseling lacking profit potential, however effective, will be discouraged. Even more worrisome are physicians who themselves own the facilities they operate. Doctors owning dialysis centers, for example, have been accused of putting patients on dialysis sooner than necessary and putting off kidney transplants that would eliminate the need for dialysis altogether.

In a system of for-profit health care, the opportunities for patient manipulation and exploitation are endless. Society must not allow the motive of economic gain to enter so directly into the practice of medicine, placing the well-being of patients in serious jeopardy, and undermining the trust so essential to the physician-patient relationship.

It is also argued that commercialized medicine will harm society, yet produce little in the way of benefits. Nonprofit hospitals undertake costly, but needed, research and maintain services which are not economically viable but which provide doctors with the training experiences necessary to medical education. Where profits rule, however, such necessary, but unprofitable, research and services important to medical education will be neglected. Furthermore, as for-profits come to dominate the health care sector, society will suffer a severe shortage of unprofitable, but critical, services, such as emergency rooms. Meanwhile, scarce resources will be squandered to produce and aggressively market lucrative, but unnecessary, services, such as cosmetic surgery.

While for-profits promise to harm society, critics continue, they fail to deliver any of the promised benefits, such as controlling health care expenditures, reducing the costs of care, and lowering the price of care. How will for-profits help control health care expenditures and the overuse of health services when, by definition, they are in the business of increasing total sales? For-profits are also unlikely to reduce the costs of care. Studies show that the rise of investor-owned hospitals has increased rather than lowered costs. Moreover, studies show that the prices charged by for-profit hospitals to paying patients, as well as the per-day expense of providing care, are higher than those of non-profits. The economic benefits promised by for-profits have not been demonstrated.

Finally, some critics of for-profit health care claim that the commercialization of medicine will lead to the abandonment of certain virtues and ideals that are necessary to a moral community. Most non profits continue to uphold an ideal of service to humankind. The virtues of caring, compassion, and charity, and a sense of community have guided their decisions about the range of services to provide and the kinds of research or education to support. The ideal of altruism has been perpetuated by physicians whose primary concern has been the alleviation of human suffering and the restoration of health. Society must not allow such important and fragile virtues and ideals to be extinguished by the self-interest that drives for-profit enterprise.

Those favoring the growing commercialization of health care argue that society ought always to follow that course of action that will bring about the greatest benefits at the least cost. A health care system run by for profits will provide the greatest benefits at the least cost.

First, for-profit health care will lower the costs of care. The amount we spend on health care every year has grown from $75 billion in 1980 to nearly $500 billion today. If this rate continues, by the year 2020, we will be spending 40 cents of every dollar we make on health care. Commercialized health care is our only hope for controlling the soaring costs and over-utilization of health services. Only the businesslike efficiency and the discipline that accompanies the drive to maximize profits can cure the ills of a system plagued by inefficiency and waste.

Under the present system, administrators and physicians have no incentives to operate in a cost-efficient manner. More concerned with institutional prestige than with the bottom line, administrators of nonprofit organizations acquire sophisticated equipment and highly trained personnel, without regard for their need or likely use. Costly technologies are adopted and services added that are only marginally beneficial. Physician's themselves are offered little incentive to concern themselves with the cost of care, and go about ordering treatments that yield little or no benefit. Moreover, the nonprofit health care system is rife with costly, under-used facilities. Cardiac operations are performed in 100 different hospitals. Millions of dollars could be saved if these 15,000 procedures could be done in 30 centers specifically built for that purpose.

As the number of for-profit health care facilities increase, we can expect to see an end to such gross inefficiency. Aiming to maximize profits, for profits will invest only in the equipment and the personnel necessary to provide services that patients actually need. Decisions about what technologies should be adopted will be based on whether the benefits of these technologies outweigh their costs. The entrepreneurial spirit will give rise to innovation in the delivery and management of services, leading to more efficient methods of production and treatment. Doctors will be forced to come to terms with what will really benefit patients, resulting in fewer unnecessary hospitalizations, shorter hospital stays, and fewer needless tests.

Lower costs also can be expected from the economies of scale achieved by for-profit corporations. Unlike nonprofit health care institutions which often operate independently of each other, for-profits are often linked

together as chains, allowing for economies in financing and management, and for centralized services and shared equipment, all resulting in lower costs.

Second, society will benefit from the enhanced access to care promised by for-profits. Currently, 37 million people are without the coverage needed to afford care. For-profits can pass on savings they achieve through more cost-efficient operations by lowering the price of care, so more people are able to afford it.

Third, for-profit health care enterprises produce benefits for society because for-profits have greater and quicker access to capital at lower costs than do non-profits. At a time when massive investments of capital are needed to keep up with the state of the art in medicine, non-profits are experiencing increasing difficulty in attracting funding. For-profits, on the other hand, can lure investors by issuing stocks, securing the money sorely needed to build and renovate facilities and to replace and modernize outdated equipment.

Proponents of for-profit enterprise in health care also support their position by maintaining that all persons have a basic right to freedom and thus a right to use their property in ways they freely choose. They argue that owners of for-profits have no special obligation to provide free services to the poor. While public funds may indeed subsidize research and medical education, it is patients and doctors who benefit from this education and research, not the owners of hospitals. If there is any obligation to serve the community in return for such subsidies, it is with patients and doctors that it lies. Nor does the possibility that hospitals have profited from an expanded market for services generated by government-subsidized programs oblige their owners to provide free care to the poor. Defense contractors profit greatly from the business generated by public funds. Yet, they are under no obligation to provide free public services. Nor can it be said that for profits unfairly impose a burden on non-profits by not assuming a fair share of the costs of caring for the poor. For-profits, unlike non-profits, pay taxes, and in doing so, can be said to pay their share in serving the poor through tax-supported public programs. To impose on owners of for profits a social obligation over and above an obligation to pay taxes is to impose an obligation on them that is not imposed on owners of other businesses.

Finally, it is argued, health care is like food, clothing and shelter. Just as these "basic needs" are sold on the market and distributed according to ability to pay, so too should health care. If some cannot afford to pay for such basic needs, it is up to the government or voluntary agencies to see that they secure it.

What is the moral response to the increasing commercialization of health care? The arguments in favor of for-profits appeal to the values we place on the freedom of free enterprise and the economic benefits that may flow from a more efficient health care system. But are we willing to uphold these values at the cost of other important values, including a concern for justice, the dignity of persons and a community-centered ethics that places the needs of people before profits? What is a "healthy" bottom line?

> "I swear by Apollo Physician and Asclepius and Hygieia and Panaceia and all the gods and goddesses, making them my witness, that I will fulfill according to my ability and judgment this oath and this covenant...I will apply...(treatment) for the benefit of the sick according to my ability and judgment; I will keep them from harm and injustice." -**Hippocratic oath**

For further reading:

Bradford H. Cray, ed., *For-Profit Enterprise in Health Care* (Washington D.C.: National Academy Press, 1986).

Bradford H. Gray, ed., *The New Health Care for Profit: Doctors and Hospitals in a Competitive Environment* (Washington, D.C.: National Academy Press, 1986).

Arnold S. Relman, M.D. "The New Medical-Industrial Complex," *New England Journal of Medicine*, Vol. 303 (October 23, 1980), pp. 963-970.

Mark Schlesinger, "The Rise of Proprietary Health Care," *Business and Health*, Vol. 2 January/February 1985), pp. 7-12.


Printer-Friendly Page

Return to Web format

## Featured Materials



**Issues in Ethics - V. 1, N. 4**
**Summer 1988**

**issue abstract**

Arrow    What Johnny Should Read

**ethical theory**

Arrow    Consistency in Ethics

**ethical briefs**

Arrow    The Morality of Marketing
         the Marlboro Man

Arrow    A Healthy Bottom Line:
         Profits or People?

**issues in ethics tools**

Arrow    Homepage    Arrow    Subscribe

The views expressed on this site are the
author's. The Markkula Center for
Applied Ethics does not advocate
particular positions but seeks to
encourage dialogue on the ethical
dimensions of current issues. The
Center welcomes comments and
alternative points of view.

- Ethics Home
- Campus Map
- About the Center
- Site Index
- Contact Us
- © 2014 Markkula Center for Applied Ethics

EST. 1851



(https://www.hospiceinnovations.org/)

Donate 👤 (/Help-Nphi-Support-Our-Members/)          Provider Locator 📍 (/Find-A-Not-For-Profit-Hospice-Care-Provider/)

Member Login ➕ (Http://Www.Nphimembers.Com)          About Us ⌄ (Https://Www.Hospiceinnovations.Org/About-Us/)

Resources ⌄ (Https://Www.Hospiceinnovations.Org/For-Patients-Families/)

Members ⌄ (Https://Www.Hospiceinnovations.Org/Members/)

Media Center ⌄ (Https://Www.Hospiceinnovations.Org/In-The-News/)

Annual Summit ⌄ (Https://Www.Hospiceinnovations.Org/Annual-Summit-2024/)

👥 Member Portal (Https://Nphi.Groupsite.Com/)

# Introducing *People Over Profits* — insights into America's Healthcare Landscape

Explore the experiences and attitudes of the American public, supported by real-life stories from caregivers

Discover what ordinary Americans feel about their healthcare system in this latest blueprint report by NPHI. Enriched by a diverse array of real-life stories from caregivers, this report offers valuable insights and a broad societal snapshot into the challenges and successes within the healthcare landscape.

*Report commissioned in collaboration with **Emergence Creative, (https://www.emergence-creative.com/)** and generously supported by funding from NPHI's 100+ members and **the Elea Institute** (https://eleainstitute.org/).

# Executive Summary

## Good Times, Bad Times

*The United States healthcare system is facing a reckoning. A set of interconnected social, demographic, medical, and economic forces are radically reshaping how healthcare works— and doesn't work—in our society. Despite America's reputation as a world leader in research, innovation, and treatment, health outcomes at the population level are getting worse even as*

*costs soar. The reason for this is not necessarily that people are getting "sicker" or that they are getting "sick" in new ways. Many of the factors that drive high costs and poor outcomes could be managed effectively and efficiently. Instead, our fractured healthcare system often stands in the way of coordinated, comprehensive, human-centered care. Resolving these tensions will require grappling with the experiences and attitudes of the American public—as well as the systemic factors that shape their perceptions. Based on that understanding, community-based, mission-driven organizations can offer a new narrative of what healthcare can and should be.*

People Over Profits

**Follow us**

(https://www.hospiceinnovations.org)

601 Massachusetts Ave, NW, Suite 520W
Washington, DC 20001 (https://goo.gl/maps/BC2aT1fFx5f9dZBx8)

**Toll Free Hot-Line to find a Provider**

1-844-GET-NPHI (438-6744)(tel:1-844-GET-NPHI)

©2024 National Partnership for Healthcare and Hospice Innovation – All rights reserved. | Privacy Policy (/privacy-policy/)

8/5/24, 1:43 PM    The health care industry must put patients over profits! National Nurses United (for nurses only)

Case 2:24-cv-01247-GMN-MDC    Document 22    Filed 08/16/24    Page 67 of 106

**California Nurses Association**

**CHEU** **CAREGIVERS & HEALTHCARE EMPLOYEES UNION**

**National Nurses Organizing Committee**

**National Nurses United**

## The health care industry must put patients over profits!

Instead of taking care of nurses, other health care workers, and our patients, the health care industry is spending millions of dollars to push patients out of the hospital so that it can make even bigger profits. Rather than admit patients, our hospitals intend to send them back home under remote supervision in a so-called "Hospital at Home" — or, as we call it, "Home All Alone" — patient-dumping scheme.

This venture will allow the health care industry to leave hospital beds empty, use outsourced, cheaper staff, and cut costs — all at the expense of patients and safe patient care.

That means patients will continue to pay high premiums but end up with significantly less nursing care! The health care industry has already made billions in profit during the pandemic. How much more do they need?

**Use the form below to add your name to our petition to demand that the health care industry end all "Home All Alone" contracts and put our patients over their profits!**

First name*

Last name*

Email address*

Personal cell phone

**Facility***

Please select

Department*

**Shift***

Please select ▾

**Add your name**

The "Home All Alone" patient-dumping scheme is extremely dangerous for patients. It keeps them far away from the ICU, OR, and from the nursing care they may need if their condition worsens. It overburdens family members who have no medical education, can't effectively respond to emergencies, and aren't equipped to carry out medical care under pressure. Further, many people don't know what constitutes a medical emergency significant enough to call 911.

For many, it's a difficult decision to go to the emergency department. With the rising costs of health care, the cost of going to the ED can be enormous. So, when patients do make that decision, it's because they have a true emergency and require the best possible care.

As nurses, as health care workers, we demand:

- The health care industry must immediately end all "Home All Alone" contracts with groups like Medically Home, Dispatch Health, Cadence, WellSky, and others.
- The health care industry must end outsourcing contracts, which jeopardize patient safety and violate our contract.
- The health care industry must hire additional direct care nurses and other health care workers to staff according to patient acuity.
- Nursing and other health care worker clinical judgment must be the cornerstone of patient care, not biased technologies and algorithms.

National Nurses United (membership) Privacy Contact



## LOUISIANA **ILLUMINATOR**

PART OF STATES NEWSROOM

GUESTS    HEALTH CARE    HEALTH POLICY

**COMMENTARY**

# Policymakers should support patients over profits in Louisiana

| KATHY OUBRE

APRIL 29, 2024    5:00 AM

     



📷 Getty Images

Every year, more than 26,000 Louisianans are diagnosed with cancer. Our state has the sixth-highest rate of new cancer diagnoses, and more than 9,000 Louisianans die from cancer each year.

8/5/24, 1:51 PM
Case 2:24-cv-01247-GMN-MDC Document 22 Filed 08/16/24 Page 70 of 106
Guest: Pharmacies should support patients over profit • Louisiana Illuminator

As the chief executive officer of Pontchartrain Cancer Center, I am frustratingly familiar with the cost of cancer care. In the U.S., the initial cost of cancer care is more than $40,000, and the continuing cost of cancer care is more than $5,000. In a cancer patient's last year of life, the cost of care is more than $100,000.

And this astonishing cost comes nowhere near the impact on the family as they navigate a cancer diagnosis, or the loss that families bear when they lose a loved one to the fight against cancer. When cancer treatment is unaffordable, care is delayed, which leads to greater treatment problems, higher costs of long-term care, and a lower chance of survival.

The need for more affordable access to treatment and care is not only real for cancer patients, but also for all Louisianans, with *U.S. News and World Report* ranking Louisiana in the bottom five states for health care in the country.

Louisiana has made significant strides to regulate the business practices of pharmacy benefit managers (PBMs) and health insurance companies, but we must address the significant rebates and discounts that PBMs and health insurers negotiate when they purchase medicine from drug manufacturers — and ensure these are a patient benefit.

Rather than using these savings to lower patients' out-of-pocket prescription costs, PBMs and insurance companies pocket the savings as profit, often overcharging patients for life-saving and life-sustaining treatments. As a result of this practice, many insured patients in Louisiana are paying nearly double what their insurers are paying for the same medicines.

## SUPPORT NEWS YOU TRUST.

DONATE

While PBMs may sound like obscure healthcare entities that are far removed from patients, the three largest PBMs — Express Scripts, CVS Caremark and Optum Rx — dominate more than 85% of the market. And all three of these PBMs are owned by large health insurance companies that dictate the patient experience: Express Scripts is owned by Cigna, Optum Rx is owned by

8/5/24, 1:51 PM
Case 2:24-cv-01247-GMN-MDC   Document 22   Filed 08/16/24   Page 71 of 106
Policymakers should support patients over profits in Louisiana • Louisiana Illuminator

UnitedHealthcare, and CVS Caremark is owned by CVS Health, which owns both Aetna and CVS Pharmacy.

These companies control what medicine patients can access, how much patients pay for it and where they can pick it up. When Louisiana's policymakers neglect regulating the practices of PBMs and health insurers, they are putting the profits of large corporations over the needs of Louisiana patients and their healthcare.

Senate Bill 347 would require PBMs and insurance companies to share the savings they receive from negotiated rebates and discounts directly with patients at the point-of-sale, lowering out-of-pocket costs.

These rebates and discounts are significant, totaling over $230 billion in 2021 alone. Given these significant profits, it's no surprise large health insurers and PBMs oppose this legislation and are threatening an increase to health insurance premiums if Louisiana passes this legislation. But we know that won't happen based on the evidence from three other states that have already implemented share-the-savings bills — none of which have seen any increase to premiums.

This is also a policy voters nationwide support. In a nationwide poll by Morning Consult, 88% of adults agree that policymakers should prioritize lowering out-of-pocket costs, and when presented with two choices, over half of the respondents preferred lower out-of-pocket costs to lower monthly premiums. With Senate Bill 347, Louisiana joins 18 states that have similar proposed legislation — legislation that would save consumers in Louisiana up to $1,000 a year in out-of-pocket costs.

It's time for Louisiana to prioritize patients, not large corporations, and lower out-of-pocket health care costs in Louisiana.



**REPUBLISH**

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. AP and Getty images may not be republished. Please see our republishing guidelines for use of any other photos and graphics.*



## KATHY OUBRE

Kathy Oubre is the chief executive officer of the Pontchartrain Cancer Center in Covington.

**MORE FROM AUTHOR**

### RELATED NEWS



**Sunshine and why it's so desperately needed in Louisiana**

BY **GREG LAROSE**

August 5, 2024



**What's with all the Olympic pearl-clutching from leaders in…**

BY **GREG LAROSE**

July 29, 2024

## SHINING A LIGHT ON THE BAYOU STATE

**DEMOCRACY TOOLKIT** ⌄



The Louisiana Illuminator is an independent, nonprofit, nonpartisan news organization with a mission to cast light on how decisions in Baton Rouge are made and how they affect the lives of everyday Louisianians. Our in-depth investigations and news stories, news briefs and commentary help residents make sense of how state policies help or hurt them and their neighbors statewide.

We're part of States Newsroom, the nation's largest state-focused nonprofit news organization.

DEIJ Policy | Ethics Policy | Privacy Policy



Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. (See full republishing guidelines.)

   

© Louisiana Illuminator, 2024

v1.39.1

# STATES NEWSROOM

---

## FAIR. FEARLESS. FREE.

Case 2:24-cv-01247-GMN-MDC   Document 22   Filed 08/16/24   Page 74 of 106



MAGAZINE     EVENTS     PODCAST                    DONATE     SEARCH     **SIGN IN**

  

# Commonweal

| Religion | Politics | Books | Culture | Collections | **Subscribe** |

# Patients Over Profits

The federal government negotiates drug prices

*The Editors*
September 24, 2023

EDITORIAL     HEALTH CARE     JOE BIDEN     ECONOMY     POLITICS

 



Joe Biden, in 2020, speaks about reducing health care costs (Adam
Schultz/Flickr).

I t's been a little more than six years since Republican senator John McCain of Arizona cast the dramatic "thumbs-down" vote that doomed his party's attempt to repeal the Affordable Care Act and preserved health care for millions of Americans. Obamacare may be imperfect, with its patchwork of providers and marketplaces and confusing plan tiers. But it is beyond question that it has done a lot of good, insuring some twenty million Americans, expanding access to Medicaid for poor and working-class people, and offering much-needed protections to women, young people, seniors, rural communities, and those with preexisting conditions. It's become so popular, even among many conservative voters, that Republican politicians don't dare talk of repealing it anymore.

Less dramatic than McCain's vote, but no less meaningful, was the Biden administration's announcement in August that the federal government under Medicare would soon begin negotiating the prices of ten prescription drugs, including treatments for diabetes, heart disease, and blood cancer. First passed as part of the 2022 Inflation Reduction Act, the provision is an important step toward achieving fairer health-care outcomes in the United States, where prescription drugs cost an average of 2.56 times more than in other countries, and where medical expenses cause the overwhelming majority of personal bankruptcies. Patients needing these ten drugs (and the twenty or so other medications to be added each year) won't be the only beneficiaries; beginning in 2025, those requiring insulin will see their out-of-pocket expenses capped at $35 per month, while yearly costs for drugs taken at home will be limited to $2,000 for all Medicare recipients. The savings accruing to taxpayers—the federal government estimates $160 billion over ten years—could be reinvested in the American health-care system, lowering costs for everyone.

This overdue measure has sparked predictable outcry from pharmaceutical companies. Sensing a threat to their outsized profit margins, among the highest of all industries, they've filed lawsuits, engaged in fear mongering, and pushed outright lies. Some of their arguments—that having to negotiate a fair price with Medicare violates their right to free speech, or that they're being subject to price controls and threatened with seizure of property—can be dismissed out of hand. Losing the right to dictate terms hardly constitutes coercion or theft. If anyone has been ripped off, it's the federal government and the taxpayers who fund it. Since 2003, when Bush-era legislation expressly prohibited the federal government from using its considerable leverage to secure better prices, Medicare has been forced into the role of a "price taker." The new provisions simply level the playing field, permitting the United States to do what it already does with other federal agencies and areas of medicine. If Medicare and the Departments of Defense and Veterans Affairs already negotiate prices for doctor visits, surgeries, and hospital stays, why should pharmaceuticals remain exempt? Besides, if drug companies really prefer not to do business with the government, they don't have to—though they would be forgoing their largest source of revenue.

More pernicious are Big Pharma's claims that if the courts don't block negotiated prices, the cost of private insurance will jump and drug companies' investment in research and development for lifesaving treatments will plunge. Neither claim stands up to scrutiny. Economists point out that if pharmaceutical companies could raise prices, they'd have done so already. In fact, the prices most private insurers pay for prescription drugs will probably go *down*, since insurers usually base what they pay on what Medicare pays. And it's not as if Big Pharma leads the way in R&D spending or in patents. Giants like Pfizer, Merck, Johnson & Johnson, GSK, and BMS spend far more on sales, marketing, and lobbying than they do

*'Sensing a threat to their outsized profit margins, among the highest of all industries, pharmaceutical companies have filed lawsuits, engaged in fear*

on R&D. It's the federally funded National Institutes of
Health that leads the world in funding medical research,
especially at pivotal earlier stages. Imagine how much
more it could do with the billions gained from savings on
prescription drugs.

Polling shows that about 80 percent of Americans approve
of the prescription-pricing plan, and President Biden has
signaled that he'll make drug pricing a centerpiece of his
2024 campaign. He should continue to press the issue of
health care, which is a winning one for Democrats and
which Republicans are largely silent on. Significant
problems remain: too many Americans lack access to
affordable mental-health care; administrative overhead
and waste accounts for nearly 30 percent of the nation's
total annual medical expenditures; fraud makes up 10
percent of what the government spends on health care.
Then there's the chronic understaffing in hospitals and
clinics, the for-profit takeover of the hospice industry, and
the rise of private-equity funds buying up everything from
nursing homes to fertility clinics, to the detriment of
patients and providers alike. But reining in the
pharmaceutical industry is an important step toward
making health care more affordable for everyone. It's also
an indication that there's the political will for the
government to stop padding corporate profits.

*mongering, and
pushed outright
lies.'*




**Also by this author**
**Biden's Choice**

Get *Commonweal's* latest, delivered twice weekly.

| Email address | Sign Up |

Please email comments to
letters@commonwealmagazine.org
and join the conversation on our
Facebook page.

**Published in the October 2023 issue:** View Contents

**Topics:**

EDITORIAL    HEALTH CARE    JOE BIDEN    ECONOMY
POLITICS

Previous Story
**Letters | Fighting featureless modernity, helping young**

Next Story
**'This Is Our Opera'**

## Most Recent



### History's Survivors

*By Gus Mitchell*
August 1, 2024



### One Year to Mourn

*By Paul Lauritzen, Mathew A. Crawford*
August 1, 2024



### Harris's Choice

*By Justin H. Vassallo*
July 31, 2024

## Must Reads



**POLITICS**

## Trump's Glitz and Graft

**"The consistent thread here is cheating, whether in business or in personal life: the two mingled for Trump."**

*Paul Moses*
June 12, 2024

## Synodal Process

**If the Church really believes in the indelible dignity of LGBTQ+ persons, it can't just express sorrow for past abuses or offer words of welcome. It has to actually do something.**

*Nick Fagnant*
June 19, 2024

## Another Productivity Hack?

**In 'Slow Productivity,' Cal Newport advises individuals to become more productive by shifting work onto others.**

*Jonathan Malesic*
June 8, 2024

**BOOKS**

## Leaving Evangelicali

**"It's not that the critiques Sarah McCammon documents in 'The Exvangelicals' are all wrong. It's that they are, by this point, very familiar."**

*Kate Lucky*
June 1, 2024

## Does Dignity Mean Now?

**A journalist, a theologian, a philosopher, and a legal scholar comment on 'Dignitas Infinita' and the questions it raises.**

*The Editors*
May 28, 2024

Newsletter      Subscribe      Donate

# Get *Commonweal's* latest, delivered twice weekly

# How you can read *Commonweal*

# Support *Commonweal's* future

Email address | **Sign Up**

**Subscribe**

**Donate**

## About

Mission

History

In the News

Careers

Staff and Contributors

Board of Directors

## Connect

Contact

Letters to the Editor

Submissions

FAQ/Privacy

## Give

Donate

Annual Report

## Advertise

Classifieds

Request Media Kit

## Subscribe

Renew

Customer Service

Give a Gift Sub

For Students

**Religion    Politics    Books    Culture    Collections    Subscribe**

Magazine    Events    Donate    Podcast

  

© 2024 Commonweal Magazine. All rights reserved. Design by Point Five. Site by Deck Fifty.

# Tell our Politicians to take the **Patients Over Profits** Pledge.

The Pledge calls on politicians to reject campaign contributions from the executives, lobbyists, and PACs affiliated with the corporate health care industry, including private insurers, pharma corporations, and private hospitals who are organizing to take over our health care system. The pledge is supported by a broad coalition of organizations dedicated to working on health care justice.



### Supporters: **Take Action**

#### Politicans: **Take the Pledge**

---

THE PLEDGE

# Patients <u>Over</u> Profits

❝ CEOs and lobbyists for Big Pharma, corporate insurers, and private hospitals have formed a front group called Partnership for America's Healthcare Future that wants

# Patients <u>Over</u> Profits

Case 2:24-cv-01247-GMN-MDC   Document 23   Filed 08/16/24   Page 83 of 106

keeping us sick.

I pledge to put patients over profits and not take contributions over $200 from the executives, lobbyists, and PACs affiliated with the corporate health care industry, including private insurers, pharma corporations, and private hospitals who are organizing to take over our health care system."

**Politicians: Take the Pledge**





# Get Involved

**Not a politican, but want to help get electeds on the pledge?**

Supporters: **Take Action**



# Why Take the Pledge?

The corporate health care industry causes harm to patients every day in the endless pursuit of profits. Those same corporations use their billions in profits to unduly influence politicians and candidates running for office in order to prevent any significant reforms from progressing. Our organizations are urging our elected officials and those seeking office to cut ties with these organizations and corporations that bankroll the efforts to prevent any health care reform.

Politicians and candidates of all levels are welcome and encouraged to sign the "Patients Over Profits" Pledge, provided they agree to the requirements and complete the steps for signing. We're calling on you - stand with patients and sign the pledge!

**Politicians: Take the Pledge**

## Organizations who have endorsed the pledge:







































The Arizona Medicare for All Coalition







---



Made with Middle Seat

8/5/24, 1:41 PM
Patients Over Profits - Tell our Politicians to Take the Pledge
Case 2:24-cv-01247-GMN-MDC Document 22 Filed 08/16/24 Page 88 of 106

Privacy Policy



# EXHIBIT G

Emails dated June 7, 2024
and June 26, 2024
with Attachments

FW: Union Literature



📎 4 attachments (5 MB)

IMG_0375.jpeg; IMG_0374.jpeg; IMG_0358.jpeg; IMG_0356.jpeg;



**From:** Quentinn Macklin - SEIUnv <QMacklin@SEIUNV.org>
**Sent:** Friday, June 7, 2024 6:04 AM
**To:** Kane Joan <Joan.Kane@HCAhealthcare.com>; kidist.snyder@hcahealthcare.com; Fabiola Morales - SEIUnv <fmorales@seiunv.org>; Patrick O'Connor - SEIUnv <POconnor@SEIUNV.org>; Salahadin El-Amin - SEIUnv <selamin@seiunv.org>
**Subject:** Union Literature

Hello attached is the union literature being posted and distributed at Sunrise today.

Get **Outlook for iOS**

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.



# AGREEMENT

**COLLECTIVE BARGAINING AGREEMENT**

## SUNRISE HOSPITAL &
## MEDICAL CENTER

AND

## SERVICE EMPLOYEES
## INTERNATIONAL UNION
## LOCAL 1107

# JUNE 16, 2023 - MARCH 31, 2026



**LOCAL 1107 SEIU NEVADA**

## LET'S PLAN

# PRIDE

You are invited to help your local SEIU 1107 Lavendar Caucus plan our participation in this year's PRIDE Parade. Please fill out the interest survey and attend our first meeting.

## INTEREST MEETING:

**WEDNESDAY, JUNE 26**  **6PM ON ZOOM**

## SCAN TO REGISTER:



## BRING YOUR FESTIVE/CREATIVE THOUGHTS!

*COME TO OUR MEMBER STRENGTH TRAINING:*

# LEADER OF LEADERS

Service Employees International Union - Local 1107

**Let's make this a year like no other for the Labor Movement in Nevada!**

**Date:** **Saturday June 29, 2024**

**Time:** **10am to 2pm**

**Location:** **SEIU Local 1107**

*2250 S. Rancho Dr, Las Vegas, NV 89102*



Sign up here:



**bit.ly/49uvUfa**

It's time for you to **join the movement** and learn how to build power! The more workers who get active, the more improvements we can secure to our wages, benefits, and working conditions.

STAND WITH US ONLINE

  

@SEIU1107

**WE ARE SEIU 1107**



2250 S. Rancho Dr. #165
Las Vegas, NV 89102
(702) 386-8849
WWW.SEIUNV.ORG



# BUILDING POWER THROUGH MEMBER STRENGTH TRAINING

## Let's make this a year like no other for the Labor Movement in Nevada!

### Worksite Issues (makeup session)
Date: **Friday, May 17, 2024**
Time: **10am to 2pm**

*SIGN UP HERE >>>* 

### Recruiting/Developing your Team
Date: **Saturday, June 1, 2024**
Time: **10am to 2pm**

*SIGN UP HERE >>>* 

### Recruiting/Developing your Team (makeup session)
Date: **Friday June 21, 2024**
Time: **10am to 2pm**

*SIGN UP HERE >>>* 

### Leader of Leaders
Date: **Saturday, June 29, 2024**
Time: **10am to 2pm**

*SIGN UP HERE >>>* 

### Leader of Leaders (makeup session)
Date: **Friday July 19, 2024**
Time: **10am to 2pm**

*SIGN UP HERE >>>* 

**ALL TRAININGS AT SEIU LOCAL 1107** 2250 S RANCHO DR. STE 165 LAS VEGAS, NV 89102

It's time for you to **join the movement** and learn how to build power! The more workers who get active, the more improvements we can secure to our wages, benefits, and working conditions.

STAND WITH US ONLINE

 
@SEIU1107



2250 S. Rancho Dr. #165
Las Vegas, NV 89102
(702) 386-8849
WWW.SEIUNV.ORG

## FW: Union Literature



📎 8 attachments (13 MB)

IMG_0375.jpeg; IMG_0374.jpeg; IMG_0358.jpeg; IMG_0356.jpeg; processed-F2FC2E91-5F8D-4B42-9968-6E0A81C318C3.jpeg; processed-34F2FD6C-7ABD-4B10-BF23-7E9F8E9D7844.jpeg; processed-B0E70A70-648A-46EF-8BD0-C51A1785BF74.jpeg; processed-9FE638FF-8425-4632-A214-54CC2EE2B6D6.jpeg;



**From:** Quentinn Macklin - SEIUnv <QMacklin@SEIUNV.org>
**Sent:** Wednesday, June 26, 2024 6:03 AM
**To:** Kane Joan <Joan.Kane@HCAhealthcare.com>; kidist.snyder@hcahealthcare.com; Patrick O'Connor - SEIUnv <POconnor@SEIUNV.org>; Fabiola Morales - SEIUnv <fmorales@seiunv.org>; Salahadin El-Amin - SEIUnv <selamin@seiunv.org>
**Subject:** Union Literature


Hello attached is the Union literature being posted and distributed at sunrise today.
Get Outlook for iOS


**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.



AGREEMENT

COLLECTIVE BARGAINING AGREEMENT

**SUNRISE HOSPITAL &
MEDICAL CENTER**

AND

**SERVICE EMPLOYEES
INTERNATIONAL UNION
LOCAL 1107**

JUNE 16, 2023 - MARCH 31, 2026

**SEIU**
Stronger Together

# Assignment Despite Objection Form

1. Hospital/Facility _____ Date _____ Shift/Unit_____

2. Name_____ RN ____ LVN ____ CNA ____ Other _____

3. Home Phone _____ Cell Phone _____ E Mail _____

4. **Concern (To guarantee patient confidentiality, do not use patient names or other identifiers):**
   - ☐ Admission/Transfer Issues
   - ☐ Patient acuity concerns
   - ☐ Reduction in support staff (CNAs, clerks, transport, EVS, RT, techs, other _____
   - ☐ Required by manager to work beyond my scheduled hours or area/mandatory overtime.
   - ☐ Patient coverage during breaks/meals
   - ☐ Missed: Meal period ☐ Breaks ☐ Worked O/T ☐
   - ☐ Equipment/supplies
   - ☐ Training for assignment
   - ☐ Administration of meds/procedure issues
   - ☐ Response to call lights
   - ☐ Time to chart/document
   - ☐ Time to provide patient family education.

   Unit Census _____ Capacity _____ Acuity: High _____ Average _____ Low _____

7. Staffing Numbers: RNs ____ LVNs ___ CNAs ___
8. Was incident report filed? ☐ Yes
   Was HIPAA patient privacy observed? ☐ Yes        Other _____
9. Treatments: Check which apply to assignment.

**IVS**

| | | |
|---|---|---|
| ☐ Inserts | **Frequency** | ☐ Isolation Patients _____ |
| ☐ D/C's | ☐ Blood draws/Lab/ABG | ☐ Wound/Drain care |
| ☐ IVPB/IVP | ☐ Blood administration | ☐ Dressing changes |
| ☐ Titrating gtts | ☐ Pre-op/procedure prep | ☐ Procedures/Sedation |
| ☐ Epidurals/PCA | ☐ Post-op/procedures | **Respiratory Treatments** |
| **Medications** | ☐ Amb/OOB w/assist | ☐ Breathing Treatments |
| ☐ Pain | ☐ Assist w/meals | ☐ Intubation/Code Blue |
| ☐ PRN | ☐ Transport | ☐ Ventilator Care/Support |
| ☐ PO/Injections | ☐ Admissions/Discharges | ☐ Total Care/Turning |
| ☐ Multiple/Frequent | ☐ Hemodynamic Monitor | ☐ Education |
| ☐ Finger stick Glucose/Coverage | ☐ Pharmacy/Lab trips | ☐ Ortho Care/Spinal Precaution |
| | ☐ Restraints | ☐ Respiratory Distress/Suctioning |

10. Requested assistance from manager or supervisor? ☐ Yes

Supervisor/Manager name: _____

What was his/her response? _____
_____
_____



# IT'S THE LAW!



LOCAL 1107
SEIU NEVADA

## You have the right to be safe on the job!

### WHAT IS AN ASSIGNMENT DESPITE OBJECTION (ADO) FORM?

If you believe you have been given an assignment that places a patient and/or staff at risk, you have the **RIGHT** to file an ADO Form. This form:

- Notifies Hospital Management that an RN/CNA received an unsafe assignment that places patients/staff at risk.

- Formally documents the circumstances in which an RN/CNA may believe a staffing situation is unsafe.

- Protects License of RNs and CNAs. An ADO may save your career.

- Holds management responsible for ongoing staffing issues.

- Alerts the hospital of compromised patient care situation.

### HOW TO FILL OUT AN ADO FORM

Complete an **Assignment Despite Objection** form as soon as possible upon receiving objectionable assignment, but without interrupting your work or patient care.

**ADO forms must be completed in their entirety**

1. **Give a copy to your immediate supervisor.**

2. **Send a copy to SEIU Local 1107**
   a. via fax: (702) 386-4883
   b. via email: **memberaction@seiunv.org**
   c. Mail/Drop off:
      2250 S Rancho Dr #165
      Las Vegas, NV 89102

3. **Send a copy to Nevada Department of Health and Human Services, Division of Public and Behavioral Health (DPBH)**
   a. via fax: (775) 687-7570
   b. via email: dpbh@health.nv.gov
   c. via mail: 4150 Technology Way
      Carson City, NV 89706

**\*\*Keep the complete original copy of your ADO Form for your records\*\***

**\*\*Do NOT identify patient(s) in any way\*\***



### Scan here to download/print an ADO Form ⟩⟩⟩

Questions? Contact SEIU 1107 Union Organizer:
**Krystal Velez: (702) 277-0401 or kvelez@seiunv.org**



 **STAND WITH US ONLINE**


 Facebook.com/SEIUNevada
@SEIU1107   @SEIU1107

 **WE ARE SEIU 1107**



2250 S. Rancho Dr. #165
Las Vegas, NV 89102
(702) 386-8849
WWW.SEIUNV.ORG



# WHY BELONG?

**LOCAL 1107 SEIU NEVADA**

## BENEFITS OF MEMBERSHIP

- ✔ Bargaining Power to Improve Wages and Working Conditions
- ✔ Health and Welfare Programs
- ✔ Job Security
- ✔ Retirement Security
- ✔ Political Influence on Matters Affecting Public Employees
- ✔ Training
- ✔ Advice on All Employment Matters
- ✔ Grievance Representation
- ✔ Eligible to Vote in Union Elections and Serve on Committees
- ✔ Participation in Professional Organizations
- ✔ A Voice in Union Elections and Serve on Committees
- ✔ A Voice in Local and State Government
- ✔ Union Member Discounts and Perks

## REASON TO THANK UNIONS

- Weekends without work
- All breaks at work, including lunch breaks
- Paid vacation
- Family & Medical Leave Act (FMLA)
- Sick leave
- Social Security
- Minimum wage
- Civils Rights Act/Title VII-prohibits employer discrimination
- 8-hour workday
- Overtime pay
- Child labor laws
- Occupational Safety & Health Act (OSHA)
- 40-hour workweek
- Workers' compensation
- Unemployment insurance
- Pensions
- Workplace safety standards and regulations
- Employer health care insurance
- Collective bargaining rights for employees
- Wrongful termination laws
- Age Discrimination in Employment Act of 1967 (ADEA)
- Whistleblower protection laws
- Employee Polygraph Protection Act (EPPA)—prohibits employers from using a lie detector test on an employee
- Veteran's Employment Training Services (VETS)
- Raises
- Sexual harassment laws
- American's With Disabilities Act (ADA)
- Holiday pay
- Employer dental, life, and vision insurance
- Privacy rights
- Pregnancy and parental leave
- Military leave
- The right to strike
- Equal Pay Acts of 1963 & 2011—requires employers to pay men and women equally for the same amount of work

**FOLLOW US:**

f Facebook.com/SEIUNevada

🐦 @SEIU1107    📷 @SEIU1107

**LOCAL 1107 SEIU NEVADA**

2250 S. RANCHO DR. #1
LAS VEGAS, NV 891
(702) 920-59
WWW.SEIUNV.C

# COME TO OUR MEMBER STRENGTH TRAINING:

# LEADER OF LEADERS

### Service Employees International Union - Local 1107

## Let's make this a year like no other for the Labor Movement in Nevada!

**Date:** **Saturday June 29, 2024**

**Time:** **10am to 2pm**

**Location:** **SEIU Local 1107**

2250 S. Rancho Dr, Las Vegas, NV 89102





Sign up here:

bit.ly/49uvUfa

It's time for you to **join the movement** and learn how to build power! The more workers who get active, the more improvements we can secure to our wages, benefits, and working conditions.

**STAND WITH US ONLINE**

  

@SEIU1107

## WE ARE SEIU 1107



2250 S. Rancho Dr. #165
Las Vegas, NV 89102
(702) 386-8849
WWW.SEIUNV.ORG



# BUILDING POWER THROUGH MEMBER STRENGTH TRAINING

## Let's make this a year like no other for the Labor Movement in Nevada!

### Worksite Issues (makeup session)
**Date:** Friday, May 17, 2024
**Time:** 10am to 2pm

*SIGN UP HERE >>>*



### Recruiting/Developing your Team
**Date:** Saturday, June 1, 2024
**Time:** 10am to 2pm

*SIGN UP HERE >>>*



### Recruiting/Developing your Team (makeup session)
**Date:** Friday June 21, 2024
**Time:** 10am to 2pm

*SIGN UP HERE >>>*



### Leader of Leaders
**Date:** Saturday, June 29, 2024
**Time:** 10am to 2pm

*SIGN UP HERE >>>*



### Leader of Leaders (makeup session)
**Date:** Friday July 19, 2024
**Time:** 10am to 2pm

*SIGN UP HERE >>>*



## ALL TRAININGS AT SEIU LOCAL 1107  2250 S RANCHO DR. STE 165 LAS VEGAS, NV 89102

It's time for you to **join the movement** and learn how to build power! The more workers who get active, the more improvements we can secure to our wages, benefits, and working conditions.

STAND WITH US ONLINE

 
@SEIU1107



2250 S. Rancho Dr. #165
Las Vegas, NV 89102
(702) 386-8849
WWW.SEIUNV.ORG



## LET'S PLAN

# PRIDE

You are invited to help your local SEIU 1107 Lavendar Caucus plan our participation in this year's PRIDE Parade. Please fill out the interest survey and attend our first meeting.

## INTEREST MEETING:

**WEDNESDAY, JUNE 26**  **6PM ON ZOOM**

## SCAN TO REGISTER:



## BRING YOUR FESTIVE/CREATIVE THOUGHTS!

THE NEVADA LOCAL 1107 SEIU AFRICAN AMERICAN CAUCUS
CORDIALLY INVITES YOU TO

# MEMBERSHIP
# MEETING



**6:30PM**

JULY 18      OCT 17
AUGUST 15    NOV 15
SEPT 19      DEC 19

SEIU 1107 HALL

## 2250 S RANCHO DR, UNIT 165
## LAS VEGAS, NV 89102

QUESTIONS? CONTACT:
, PRESIDENT
ALICIA SMITH, 1ST VICE PRESIDENT (702) 750-5656
SALAH EL-AMIN, 2ND VICE PRESIDENT (702) 793-7057

# EXHIBIT H

## Las Vegas Review Journal Article Regarding Lawsuit

Case 2:24-cv-01247-GMN-MDC Document 22 Filed 08/16/24 Page 105 of 106

# 'Put people over profits': Las Vegas hospital sues union for protest signs on booklet cover



Sunrise Hospital and Medical Center sued SEIU Local 1107 for breaching a "mutual respect" clause in its collective bargaining agreement. The hospital alleges the union violated the agreement when it included disparaging photos, outlined in red, that…



By **McKenna Ross** Las Vegas Review–Journal

July 17, 2024 - 1:14 pm

  

Don't miss the big stories. Like us on Facebook.   Like 324K

 **Listen to this article now**

-02:00      

Presented by **NAQVI INJURY LAW**

A Las Vegas Valley medical center has sued its nursing and service union to stop it from using photos on member documents that demand the hospital "put people over profits," according to a complaint.

7/17/24, 4:38 PM
Case 2:24-cv-01247-GMN-MDC   Document 22   Filed 08/16/24   Page 106 of 106
Las vegas hospital sues union for protesting signs on booklet cover-Review-Journal

Sunrise Hospital and Medical Center alleges the SEIU Local 1107 – representing almost 3,300 nurses and other technical and business office employees at the hospital on Maryland Parkway – breached a "mutual respect and commitment" clause described in the union's collective bargaining agreement that took effect in June 2023.

At issue is the cover of the union's collective bargaining agreement booklet distributed to members, according to the lawsuit filed on July 10 in the U.S. District Court of Nevada. The front cover shows a collection of union member photos, including two photos of members holding posters that say "HCA Healthcare: put people over profits." The back cover includes a graphic of a fist and a slogan: "Respect us, pay us, protect us."

Both lawyers and a media representative for the hospital system did not respond to requests for comment by publication time. A representative for the local SEIU declined to comment on Wednesday.

In June, hospital officials requested the union remove the photos from future versions and collect ones already sent out to members. But a union official declined to do so, saying the group "saw no difference" between a previous cover with similar signs featured in a half-page photo, according to court records.

Hospital officials said they believe the breach could cause "irreparable harm" to its reputation and commitment to care delivery, lawyers wrote in the complaint.

Sunrise seeks a preliminary injunction to stop the union from circulating its collective bargaining agreement and collect and destroy the existing ones.

Contact McKenna Ross at mross@reviewjournal.com. Follow @mckenna_ross_ on X.

## MORE STORIES